O'HARE EXPRESS, INC., *et al.*, Plaintiffs-Appellants, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (1st Division)   Nos. 1—90—1461, 1—90—2300 cons.

Opinion filed August 31, 1992.—Rehearing denied October 15, 1992.—Modified opinion filed October 19, 1992.

Brydges, Riseborough, Morris, Franke & Miller, of Chicago (Thomas A. Morris, Jr., and Gary E. Cooke II, of counsel), for appellants.

Katten, Muchin & Zavis, of Chicago, for appellee Keeshin Charter Services, Inc.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal and Jean Dobrer, Assistant Corporation Counsel, of counsel), for other appellees.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs O'Hare Express, Inc., and O'Hare Express/Jimray Corp. (O'Hare Express) appeal from the April 16, 1990, finding of the trial court that the City of Chicago (City) was not required to use a competitive bidding process pursuant to section 8—10—3 of the Illinois Municipal purchasing act for cities of 500,000 or more population (purchasing act) (Ill. Rev. Stat. 1989, ch. 24, par. 8—10—3) to procure an airport bus shuttle service. Plaintiffs further appeal from the March 30, 1990, and July 26, 1990, orders of the trial court dismissing count II of their complaint and amended complaint, respectively, for failure to state a cause of action. For the following reasons, we reverse and remand this matter to the trial court for further proceedings. The following facts are relevant to this appeal.

In 1984, the City solicited sealed bids for a bus transportation service contract at the O'Hare International Airport (O'Hare) Interim Terminal No. 4 (Terminal No. 4). The City awarded a five-year contract to O'Hare Express. The contract called for O'Hare Express to provide a shuttle bus service for passengers and crew between Terminal No. 4 and the hardstand area where airplanes arrived at and departed from O'Hare. The expiration date of the contract was March 16, 1990.

In August 1989, prior to the conclusion of O'Hare Express' contract, the City determined that the new terminal would not be completed until 1993, and that bus service would be necessary for three additional years. At that time, the City Department of Purchasing chose to relet the O'Hare bus service contract as a "cost-reimbursement contract," using a procurement process called a request for proposal (RFP) instead of inviting submission of sealed bids. In a RFP, the contractor develops a proposal describing the services it will provide and what the costs will be, and the public purchasing agent selects the contractor based on a consideration of price and the product

or service proposed. Under a cost-reimbursement contract, the contractor is reimbursed for costs on a monthly rather than annual basis.

The City advertised for submission of proposals and received three, including offers from O'Hare Express and codefendant Keeshin Charter Services (Keeshin). The record indicates that O'Hare Express' proposed cost for one year was $2,723,087, while Keeshin's proposed cost for one year was $3,785,481.

On February 22, 1990, plaintiffs filed a complaint in chancery seeking a temporary restraining order (TRO) and permanent injunction, to prevent the City from entering into a contract for bus services with Keeshin. In count I, plaintiffs alleged that the City was required by the purchasing act (Ill. Rev. Stat. 1989, ch. 24, par. 8—10—3) to engage in competitive bidding for the continuation of the bus service contract, and that the RFP solicitation was contrary to the law and not in the interest of the taxpaying public. In count II, plaintiffs alleged that the City's request for plaintiffs to participate in the transition to Keeshin by making the buses and personnel available for inspection and training of Keeshin's employees required plaintiffs to work past the contract expiration and thus constituted breach of contract. In count III, plaintiffs alleged that the City intentionally interfered with the union contracts of O'Hare Express drivers by coercing them to deal with a nonunion contractor. In response, the City filed a motion to dismiss plaintiffs' complaint.

The trial court conducted a hearing on February 23, 1990, denied both plaintiffs' motion for TRO and the City's motion to dismiss, and set the matter for trial on count I of plaintiffs' complaint. Plaintiffs voluntarily withdrew counts II and III of their complaint without prejudice to reinstate.

On March 9, 1990, plaintiffs filed an amended complaint in chancery for declaratory and injunctive relief. In count II, plaintiffs alleged that the following actions of the City showed favoritism to Keeshin: (1) the contract between O'Hare Express and the City did not contain any language relating to a transition at the end of the contractual period; (2) on February 2, 1990, O'Hare Express received a letter from the City stating that the City had selected another firm for services, but that the O'Hare Express proposal had not been rejected. On the afternoon of February 2, O'Hare Express received a phone call from the Department of Aviation requesting that O'Hare Express representatives meet with the Department of Aviation to discuss transition to a new contractor; (3) a letter from Mary Rose Loney, the first deputy commissioner of aviation, dated February 7, set forth the procedures which would be followed during the transition

period; (4) on February 15, the Department of Aviation called O'Hare Express and demanded that O'Hare Express post a notice at the O'Hare Express time clock that applications for employment would be taken by the new contractor. On or about February 19, Keeshin advertised in the Chicago Sun-Times for drivers because they did not have enough qualified drivers for services at Terminal No. 4. On February 21, Cecilia Ice-Gibson, the O'Hare Terminal manager, told Danny Cargin, a representative of O'Hare Express, that Keeshin was having trouble finding drivers and asked him to pass out Keeshin's number to O'Hare Express employees; and (5) the City attempted to require O'Hare Express to make buses and personnel available for the training of Keeshin's employees, to arrange access for auditing of inventory, and to require O'Hare Express to work past contract expiration.

Plaintiffs further alleged in count II that the City arbitrarily utilized an improper selection process and exhibited improper bias toward Keeshin, noting that: (1) Keeshin had no hardstand apron experience; (2) Keeshin's bid was $1,050,000 higher than O'Hare Express' bid; (3) Keeshin did not have the required participation of women or minority business enterprises; and (4) Keeshin is a nonunion employer. Plaintiffs also alleged that the City showed an improper bias toward Keeshin and that such bias grew out of questions regarding O'Hare Express' service history. Plaintiffs filed a motion for temporary restraining order based upon the allegations of count II.

On March 15, the trial court conducted a hearing and denied plaintiffs' motion, and both the City and Keeshin filed a motion to dismiss count II of plaintiffs' amended complaint under section 2—615 of the Code of Civil Procedure for failure to state a cause of action. (Ill. Rev. Stat. 1989, ch. 110, par. 2—615.) On March 30, the trial court granted defendants' motion to dismiss and gave plaintiffs 28 days to replead count II.

Trial on count I of plaintiffs' amended complaint commenced on April 10. At trial, Francis Ferrone, co-owner of O'Hare Express, testified that the nature of the 1984 contract was to run a shuttle bus service along a 1.210-mile route between Terminal No. 4 and the hardstand where the airplanes were located. He stated that the City specified the type and number of buses and provided schedules of flight arrivals and departures.

Berry Morris, assistant manager of Terminal No. 4 and manager of vehicle maintenance, stated that the bus route would be the same for anybody submitting a proposal under the RFP. He further stated

that there was no difference between what Keeshin was going to be providing and what O'Hare Express provided.

Mary Rose Loney testified on behalf of the City that the O'Hare Express buses were not meeting the arriving planes in a timely manner and that O'Hare Express was unable to respond adequately to the extreme time pressures created by an increasing volume of traffic and changing flight schedules. She stated that when she began her position with the City on December 4, 1989, the City had already decided to use the RFP process instead of the sealed bid process, and that negotiations with Keeshin began in early January 1990. On March 14, 1990, the City concluded negotiations with Keeshin. Loney further stated that taxpayer money was not involved in the shuttle bus contract because the airlines paid for the service.

Lawrence Calhoun, an auditor for the City of Chicago, testified that in January of 1989, the City began to reevaluate the bus contract and to discuss ways in which on-time performance could be improved and in which safety could be enhanced. He testified that O'Hare Express miscalculated its proposed costs for annual service and that the actual cost for O'Hare Express would have been $3,463,623 rather than $2,723,087, approximately $320,000 lower than Keeshin's cost.

Paul Spieles, assistant purchasing agent for the City, testified that the City and the Department of Aviation held meetings in July and August 1989 and determined that the most important features of the shuttle bus contract were superior performance and the quality of the provider. Thus, Spieles concluded, competitive bidding would not be required, and the City was therefore exempt from engaging in competitive bidding under section 8—10—4 of the purchasing act. (Ill. Rev. Stat. 1989, ch. 24, par. 8—10—4.) Spieles stated that the shuttle bus contract had features similar to "professional services" which are excluded from competitive bidding under section 8—10—4. Spieles recommended that the City utilize the RFP process for the new contract instead of sealed bidding because cost reimbursement was not available under a sealed bid contract. Spieles stated that cost reimbursement would enable the City to pay for the "actual costs" of the service as they arose, and that under such a payment procedure, the City could obtain the most qualified and capable contractor.

McNare Grant, Jr., former first deputy purchasing agent for the City, testified as a rebuttal witness for the plaintiffs. He stated that during his tenure with the City, he knew of no other situation where a bid contract was changed to a RFP. He further stated that under a sealed bid, a contractor can be paid through a cost-reimbursement type of procedure.

On April 16, the trial judge ruled in favor of the defendants. The trial court found the City exempt from engaging in competitive bidding for the shuttle-bus contract pursuant to section 8—10—4 of the purchasing act.

On May 11, plaintiffs amended count II and added count III for breach of contract. In response, both the City and Keeshin filed motions to dismiss count II and to transfer count III to the law division. On July 26, the trial court dismissed count II, finding that plaintiffs failed to state a cause of action, and transferred count III to the law division. Plaintiffs originally filed two separate, timely notices of appeal of the trial court's finding and orders, and the appeals have been consolidated by this court.

The central issue in this case is whether the City properly complied with the purchasing act in awarding the shuttle-bus contract to Keeshin. Plaintiffs contend that the trial court erred in finding the City exempt from competitive bidding. We agree.

■ The Illinois General Assembly has mandated that the City of Chicago is required to follow certain procedures when awarding contracts. These procedures are described in Division 10 of the purchasing act, which describes the requirements for "Purchasing and Public Works Contracts in Cities of more than 500,000." (Ill. Rev. Stat. 1989, ch. 24, pars. 8—10—1 to 8—10—25.) Among other requirements, the City must engage in competitive bidding in awarding contracts. Section 8—10—3 of the purchasing act states:

> "Except as otherwise herein provided, *all purchase orders or contracts* of whatever nature, for labor, services or work, the purchase, lease, or sale of personal property, materials, equipment or supplies, involving amounts in excess of $10,000, made by or on behalf of any such municipality, shall be let by free and open competitive bidding after advertisement, to the lowest responsible bidder ***." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 24, par. 8—10—3.)

Section 8—10—4 provides an exception to section 8—10—3 as follows:

> "Contracts which by their nature are not adapted to award by competitive bidding, such as but not limited to contracts for the services of individuals possessing a *high degree of professional skill where the ability or fitness of the individual plays an important part*, contracts for supplies, materials, parts or equipment which are available only from a single source *** shall not be subject to the competitive bidding requirements of this Article." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 24, par. 8—10—4.

■ Our supreme court has consistently stated that the fundamental rule of statutory construction is to ascertain and give effect to the true intent and meaning of the legislature. (*Hernon v. E.W. Corrigan Construction Co.* (1992), 149 Ill. 2d 190, 194; *State v. Mikusch* (1990), 138 Ill. 2d 242, 247, 562 N.E.2d 168; *County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 485 N.E.2d 1076.) If the meaning of a statute is plain and unambiguous, the courts cannot imply any other meaning. (*Hernon*, 149 Ill. 2d at 194-95; *Triple A Services, Inc. v. Rice* (1989), 131 Ill. 2d 217, 229, 545 N.E.2d 706; *City of Decatur v. German* (1923), 310 Ill. 591, 595, 142 N.E. 252.) " 'There is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute imports.' " *Graham*, 109 Ill. 2d at 151-52, quoting *People ex rel. Scott v. Schwulst Building Center, Inc.* (1982), 89 Ill. 2d 365, 371.

In this case, the statutory language in section 8—10—3, *i.e.*, "Except as otherwise herein provided, *all purchase orders or contracts* *** shall be let by free and open competitive bidding*" (emphasis added), clearly indicates the intent of the legislature: that the City is to engage in competitive bidding for *all* contracts. (Ill. Rev. Stat. 1989, ch. 24, par. 8—10—3.) Section 8—10—4 is similarly clear in describing what contracts do not require competitive bidding, *i.e.*, "contracts for the services of individuals *possessing a high degree of professional skill where the ability or fitness of the individual plays an important part.*" (Emphasis added.) Ill. Rev. Stat. 1989, ch. 24, par. 8—10—4.

■ The purposes behind requiring governmental units to engage in competitive bidding are to " '[i]nvite competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable.' " (*Smith v. F.W.D. Corp.* (1982), 106 Ill. App. 3d 429, 431, 436 N.E.2d 35, 36, quoting 10 E. McQuillin, Municipal Corporations §29.29, at 302 (3d ed. 1981).) Historically, competitive bidding statutes in Illinois have not authorized the unbridled discretion of the municipality in awarding contracts. For example, in *City of Chicago v. Hanreddy* (1902), 102 Ill. App. 1, *aff'd* (1904), 211 Ill. 24, the successful contractor in a competitively bid sewer construction contract abandoned the work before completion, and the City chose to complete the construction using hired day laborers. (*Hanreddy*, 102 Ill. App. at 6.) The Illinois Supreme Court held that the City was required to engage in competitive bidding under section 50 of article 9 of the City and Villages

Act of 1872, which required competitive bidding for all municipal contracts in excess of the statutory amount of $500:

> "The language of the section is, 'any work or other public improvement, when the expense thereof shall exceed $500, shall be let to the lowest responsible bidder.' *No discretion is thereby conferred upon the city* or any of its officers as to whether the work or improvement shall be constructed under contract or by day labor \*\*\*.
>
> \*\*\* To hold that the statute does not apply to an unfinished public improvement \*\*\* would be to permit contracts for public improvements to be let to irresponsible parties, which \*\*\* would open wide the door to fraud and destroy competition, and enable city officials to do indirectly what in express terms they are prohibited from doing by the statute. \*\*\* The statute \*\*\*does not authorize the municipality to complete the improvement by day labor \*\*\*. To hold otherwise would be to nullify the statute." (Emphasis added.) (*Hanreddy*, 211 Ill. at 32-33.)

The teachings of *Hanreddy* are still with us. See, *e.g.*, *Inskip v. Board of Trustees of University of Illinois* (1962), 26 Ill. 2d 501, 514, 187 N.E.2d 201, 208 (city has no discretion where a statute requires that contracts for "work or other public improvement" be let by competitive bidding); *M.A.T.H., Inc. v. Housing Authority* (1976), 34 Ill. App. 3d 884, 341 N.E.2d 51 (statute does not authorize housing commission to renegotiate a contract without competitive bidding).

In support of the contention that the City had the discretion to choose between the two sections of the purchasing act in awarding the shuttle bus contract, the City relies upon the only two cases interpreting section 8—10—4, *Hassett Storage Warehouse, Inc. v. Board of Election Commissioners* (1979), 69 Ill. App. 3d 972, 387 N.E.2d 785, and *People ex rel. Adamowski v. Daley* (1959), 22 Ill. App. 2d 87, 159 N.E.2d 18. Neither of these cases is persuasive, however, as both cases are distinguishable from the present case.

In *Hassett*, the contract at issue concerned the storage and cartage of election equipment. The contractor admitted, and the board agreed, that the storage and cartage of election equipment required a high degree of professional skill. (*Hassett*, 69 Ill. App. 3d at 982, 387 N.E.2d at 791.) The contract required, *inter alia*, the safe storage of 1,300 voting machines and the safe delivery of voting machines and other election equipment to polling places for use on election days. (*Hassett*, 69 Ill. App. 3d at 981.) These services were to be performed six times for the six elections scheduled during the term of the contract. (*Hassett*, 69 Ill.

App. 3d at 981.) The court held that the contract was of a nature "not adapted to award by competitive bidding," because it required, among other things, "near perfect performance under extreme time pressures." The court noted:

> "[T]he failure of a contractor to perform his obligations properly could disenfranchise registered voters in an area and do irreparable damage to an election." *Hassett*, 69 Ill. App. at 982.

In the present case, there has been no agreement by the parties, nor is there any evidence in the record, that a shuttle bus service requires any particular degree of professional skill. Mary Rose Loney testified at trial that the contractor must respond adequately to the extreme time pressures created by an increasing volume of traffic and changing flight schedules and that the City was dissatisfied with the past performance of O'Hare Express. Paul Spieles testified that the shuttle bus service required the "most qualified" and "most capable" contractor and that such quality control could not be assured through competitive bidding.

The record reveals that the contract in the present case requires the contractor to transport arriving passengers from the plane to Terminal No. 4 without delay. The record does not reveal, however, any facts which show how the transportation of passengers one and two-tenths of a mile by bus requires the "high degree of professional skill" which would exempt the contract from competitive bidding under section 8—10—4. Violation of airline passengers' constitutional rights is not a risk apparent here.

The City's further attempt to show that the shuttle bus service was similar to the "professional services" exempt from competitive bidding in several cases outside of the jurisdiction is unavailing. (See, *e.g., Autotote Ltd. v. New Jersey Sports & Exposition Authority* (1981), 85 N.J. 363, 427 A.2d 55 (highly technical and scientific computer services); *General Engineering Corp. v. Virgin Islands Water & Power Authority* (3d Cir. 1986), 805 F.2d 88, 95 (financial advising services); *Curtis Ambulance of Florida, Inc. v. Board of Commissioners* (10th Cir. 1987), 811 F.2d 1371 (ambulance services).) The City has not indicated how any of the service contracts described in these cases are similar in any way to the shuttle bus contract at issue here.[1]

---

[1]But see *Yellow Cab of Cleveland, Inc. v. Greater Cleveland Regional Transit Authority* (1991), 72 Ohio App. 3d 558, 595 N.E.2d 508 (contract to provide special transportation services for the handicapped and elderly is not a personal services contract exempted from competitive bidding under Ohio law, and city transit authority did not have discretion to choose method of procurement of contract to provide such services).

*Adamowski* is similarly distinguishable. There, the plaintiff sought to declare void a contract for a rental car concession at Midway Airport because the City did not award the concession by competitive bidding. (*Adamowski*, 22 Ill. App. 2d at 90.) Although section 22A—3 of the municipal purchasing act (Ill. Rev. Stat. 1949, ch. 24, par. 22A—3) required competitive bidding in municipal contracts, the court held the contract valid because section 22A—4 (Ill. Rev. Stat. 1949, ch. 24, par. 22A—4) explicitly authorized the City to grant concessions without engaging in competitive bidding. The court found that interpreting the statute to require competitive bids where an exception is clearly stated would be "restrictive." *Adamowski*, 22 Ill. App. 2d at 91-92.

In the present case, there is no specific statute providing that an airport shuttle bus service contract may be let without competitive bidding. Although the City argues that the contract is not payable by the taxpayers' monies, the City does not contend that the contract was improperly let under the City's authority. Moreover, the purchasing act does not exclude contracts which involve O'Hare airport expenses. Section 8—10—3 is clearly broad enough to include the municipal contract at issue here.

The City's further argument that cost-reimbursement compensation is only available through the RFP process is unconvincing. McNare Grant, Jr., the former first deputy of purchasing for the City, testified that cost reimbursement could be utilized in a sealed bid contract.

■ The City correctly states that the court must defer to the discretion of municipal officials except where fraud, corruption or gross injustice is shown. (*Arnold v. Engelbrecht* (1987), 164 Ill. App. 3d 704, 518 N.E.2d 237; *Rocke v. County of Cook* (1978), 60 Ill. App. 3d 874, 377 N.E.2d 287.) However, the presumption of discretion is diminished here in the face of the City's failure to supply the court with sufficient facts to support its actions. It is not apparent from the record how a shuttle bus service contract calls for the type of professional services defined as not adaptable to competitive bidding under section 8—10—4. Further, the statute does not grant municipal officials the authority to choose which provision to apply in letting a municipal contract as involved herein. We conclude that the City failed to properly comply with section 8—10—3 of the purchasing act in awarding the shuttle bus contract to Keeshin. Therefore, we reverse the trial court's finding that the City had the discretion to award the contract under section 8—10—4 as contrary to the manifest weight of the

evidence. *Klaskin v. Klepak* (1989), 126 Ill. 2d 376, 389, 534 N.E.2d 971, 976.

■■ In light of the foregoing, we find that the trial court erred in dismissing count II of plaintiffs' amended complaint for failure to state a cause of action. The trial court dismissed count II of both plaintiffs' complaint and amended complaint on the grounds that the contract was properly awarded without competitive bidding; thus, favoritism could not be properly stated as a cause of action. See *Hallett v. City of Elgin* (1912), 254 Ill. 343, 346, 348, 98 N.E. 530 (courts cannot interfere, in the absence of fraud, with the exercise of the official discretion of a municipality in awarding contracts); but *cf. Cardinal Glass Co. v. Board of Education of Mendota Community Consolidated School District No. 289* (1983), 113 Ill. App. 3d 442, 447 N.E.2d 546; *Kermeen v. City of Peoria* (1978), 65 Ill. App. 3d 969, 972, 382 N.E.2d 1374 ("If a discretionary power is exercised with manifest injustice or if a palpable abuse of discretion is clearly shown, *mandamus* will issue").

The complaint must be viewed as a whole and construed liberally with a view toward doing substantial justice between the parties. (*Wolcowicz v. Intercraft Industries Corp.* (1985), 133 Ill. App. 3d 157, 478 N.E.2d 1039.) On a motion to dismiss, all well-pleaded facts in the complaint will be regarded as true and all reasonable inferences from them will be considered as correct. (*Krasinski v. United Parcel Service, Inc.* (1988), 124 Ill. 2d 483, 530 N.E.2d 468.) If the facts demonstrate any possibility of recovery under the theories alleged, the order dismissing the complaint will be reversed. *Philip I. Mappa Interests, Ltd. v. Kendle* (1990), 196 Ill. App. 3d 703, 708, 554 N.E.2d 1008.

In the present case, plaintiffs allege that the City showed favoritism and bias in electing to award the contract to Keeshin without competitive bidding, and cite numerous facts in support of their allegations. Such allegations are clearly sufficient to withstand a motion to dismiss under section 2—615 of the Code of Civil Procedure. Ill. Rev. Stat. 1989, ch. 110, par. 2—615.

For the reasons stated above, we reverse and remand this matter to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

BUCKLEY, P.J., and O'CONNOR, J., concur.