COMPASS HEALTH CARE PLANS, Plaintiff-Appellee, v. BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (4th Division) No. 1—91—2790

Opinion filed November 25, 1992.—Rehearing denied January 22, 1993.

Iris E. Sholder, of Board of Education of City of Chicago, of Chicago (Respicio F. Vazquez, of counsel), for appellants.

Thomas E. Johnson and Phillip H. Snelling, both of Johnson, Schaaf, Jones & Snelling, of Chicago, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

Defendants, the Board of Education of the City of Chicago and Ted Kimbrough, general superintendent of the Chicago Public Schools (collectively, the Board), appeal from orders denying their motion to dismiss and granting summary judgment for plaintiff Compass Health Care Plans (Compass) in an action to require the Board to comply with the competitive bidding provisions of the Illinois School Code (Ill. Rev. Stat. 1989, ch. 122, pars. 34—21.3, 10—20.21) (the Code) in the award of contracts to health maintenance organizations (HMOs) for the provision of medical benefits to employees of the Chicago Public School (CPS) system. On appeal, the Board contends that the orders in favor of plaintiff were in error because contracts with HMOs are excepted from the competitive bidding statute.

On November 5, 1990, Compass filed a two-count verified complaint against the Board seeking *mandamus* and/or declaratory relief. Count II, which sought an order requiring the Board to apply its minority and women business enterprise contracting regulations to the award of HMO contracts, was nonsuited by Compass and is not at issue in this appeal.

In count I, Compass alleged that it is a not-for-profit HMO established by the Chicago Hospital Council with 32 participating Chicago-area hospitals. From 1985 through August 1990, Compass was one of eight HMO plans available to CPS employees. In a letter dated June 29, 1990, the Board notified Compass that the number of HMO plans offered to CPS employees would be reduced from eight to four for the 1990-91 school year, and that Compass HMO would not be among the four offered. In response to a protest from Compass, the Board's chief operating officer, Robert Sampieri, wrote a letter, dated July 26, 1990, explaining that outside consultants had recommended the reduction in HMOs offered, and that the four HMOs with the highest enrollment were retained. On August 15, 1990, the Board entered into contracts with the four HMOs with the largest enrollments.

Compass subsequently filed this action seeking a declaration that the health care service contracts with those HMOs were null and void, and an order requiring the Board to contract with HMOs on the basis of competitive bidding. On January 9, 1991, Compass served the Board with interrogatories and requests for production of documents and admissions of facts. On January 25, the Board filed a motion to dismiss Compass' complaint, arguing that HMO contracts were excepted from the Code section and the Board rules requiring competitive bidding. On February 25, 1991, Compass filed a motion for summary judgment and a memorandum in response to the Board's motion to dismiss and in support of summary judgment; reply memoranda were filed in June 1991. On June 14, 1991, after a hearing, the Board's motion to dismiss was denied; and, following argument on July 26, the trial court granted Compass' motion for summary judgment and ordered the Board to comply with the competitive bidding requirements of the School Code. Compass subsequently filed a motion for a rule to show cause or, alternatively, the establishment of a deadline for the Board's compliance with the order of July 26. The Board filed a motion for a stay, and after argument on the motions, the trial court denied Compass' motions and granted the Board a stay pending appeal. This timely appeal followed.

 ▌ Included among the powers granted the Board by the School Code are:

> "To provide for or to participate in provisions for insurance protection and benefits for its employees and their dependents including but not limited to *** medical, surgical and hospitalization benefits ***. *** Such insurance or benefits may be contracted for only with an insurance company authorized to do business in this state, or any non-profit hospital service corporation organized under the non-profit Hospital Service Plan Act ***." (Ill. Rev. Stat. 1989, ch. 122, par. 10—22.3a.)

Section 34—21.3 of the Code, dealing with contracts, provides in relevant part:

> "The board shall let all contracts (other than those excepted by Section 10—20.21 of The School Code) for supplies, materials, work, and contracts with private carriers for transportation of pupils, involving an expenditure in excess of $10,000 by competitive bidding as provided in Section 10—20.21 of The School Code." (Ill. Rev. Stat. 1989, ch. 122, par. 34—21.3.)

Section 10—20.21 of the Code requires the Board:

> "To let all contracts for supplies, materials or work or contracts with private carriers for transportation of pupils involv-

ing an expenditure in excess of $5000 to the lowest responsible bidder after due advertisement, *except contracts which by their nature are not adapted to award by competitive bidding, such as contracts for the services of individuals possessing a high degree of professional skill where the ability or fitness of the individual plays an important part* \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 122, par. 10—20.21.)

Board Rule 5—4 contains nearly identical language regarding the awarding of contracts in excess of $10,000.

The Board moved for dismissal of Compass' complaint based upon the italicized portion of section 10—20.21. The Board contends that, as restrictions on the contracting power of public bodies, competitive bidding statutes should be narrowly construed (*People ex rel. Adamowski v. Daley* (1959), 22 Ill. App. 2d 87, 159 N.E.2d 18 (interpreting statute to require competitive bidding where an exception is clearly stated would be restrictive)); and, that by ordering competitive bidding for HMO contracts, the trial court erroneously expanded the competitive bidding requirement of the statute. It was the Board's position, as it is on appeal, that HMO contracts are not adapted to award by competitive bidding because they are health care contracts which involve the services of individuals, *i.e.*, medical care providers, possessing a high degree of professional skill; and that in contracting for professional services the lowest bid should not be the determinative factor.

In support of its position, the Board relies primarily on *Hassett Storage Warehouse, Inc. v. Board of Election Commissioners* (1979), 69 Ill. App. 3d 972, 387 N.E.2d 785. In *Hassett*, the Board solicited bids for the storage and cartage to and from polling places of 1,300 voting booths, ballots, registration binders and various other election materials six times during the two-year term of the contract. *Hassett* alleged that the firm which was awarded the contract did not satisfy certain specifications required by the sealed bid and that the contract therefore violated the competitive bidding requirements of the municipal purchasing statute. The court held that the contract was excepted from the competitive bidding provision because the contract placed, in the court's words,

"a tremendous responsibility on the contractor for the efficient administration of the electoral process. It requires that trust and confidence be placed in the [contractor] and requires near perfect performance under extreme time pressures. The failure of the contractor to perform his obligations properly could dis-

enfranchise \*\*\* voters \*\*\* and do irreparable damage to an election." (69 Ill. App. 3d at 982.)

The Board analogizes that HMOs are authorized to provide health care services and that such services involve no less trust and confidence than the storage and transportation of election materials.

In our view, *Hassett* is dissimilar from the case before us and not determinative of the issue presented. First, in the document soliciting competitive bids, the Board in *Hassett* expressly reserved the right to reject any and all proposals, and, notably, counsel for Hassett conceded in the trial court that the Board had not been obligated to let the contract out for competitive bidding in the first instance. Further, Hassett's complaint admitted that the contract involved expert professional skills. Those are the very matters at issue in the present case. Also, the *Hassett* court noted that Hassett's claim that competitive bidding was legally required was directly contradicted by its request that the trial court discard all of the other bids and order that the contract be awarded to it without competitive bidding. In this case, Compass did not seek an order compelling the Board to award it a contract, but merely to allow it to competitively bid for one of the four HMO contracts awarded by the Board. Further, the time and performance pressures of ensuring the safe delivery of 1,300 voting machines as well as registration binders, ballots and other voting materials to, from and among numerous polling places on each of six specific election days do not exist in the provision of HMO services.

We agree with the trial court that an HMO contract is not a contract for the direct furnishing of medical services, such as physical examinations of students, but is, instead, merely a contract for the administration of an employee health care program in which CPS employees select their own personal medical providers from a list of hospitals and doctors associated with the HMO. See *Raglin v. H M O Illinois, Inc.* (1992), 230 Ill. App. 3d 642, 595 N.E.2d 153.

The court's ruling is supported by the uncontradicted affidavit of David Dranove, the co-director of the graduate program in health administration at the University of Chicago and author of several publications in the health care economics field. In that affidavit, Dranove stated that the vast majority of Chicago-area HMOs are "individual practice association" types which do not directly provide medical services. Their principal activities are insuring the enrollees against the financial risks of health care costs, processing claims, and contracting with independent medical care providers for the provision of medical services to the enrollees of the HMO, none of which requires professional medical training. Compass and two of the HMOs awarded con-

tracts by the Board are of this type. Only 3 of the 22 HMOs operating in the Chicago area in 1989 were "staff model" HMOs, *i.e.*, those which directly provide medical services. According to Dranove, even "staff model" HMOs contract out for most hospital services. Although each HMO offers a different combination of doctors and hospitals, there is considerable overlap of providers, in that most doctors and hospitals contract with several HMOs.

Dranove further asserted that nothing about the nature of an HMO contract makes it not adapted to competitive bidding in response to employer solicitation. He stated that the practice of "comparison shopping" or "selective contracting" by employers for health care benefit packages results in substantial savings, as high as 15% to 20%, due to the increasingly high level of competition in the health care marketplace.

■ The purposes for requiring public bodies to engage in competitive bidding are to invite competition, to guard against favoritism, improvidence, extravagance, fraud and corruption and to secure the best work or supplies at the lowest price practicable. (*O'Hare Express, Inc. v. City of Chicago* (1992), 235 Ill. App. 3d 202, 208; *Smith v. F.W.D. Corp.* (1982), 106 Ill. App. 3d 429, 436 N.E.2d 35; 10 E. McQuillin, Municipal Corporations §29.29, at 302 (3d ed. 1981).) Contrary to the Board's argument, however, the competitive bidding statute does not automatically compel it to award a contract solely on the basis of the lowest cost. (*S.N. Nielsen Co. v. Public Building Comm'n* (1980), 81 Ill. 2d 290, 410 N.E.2d 40.) The statute expressly provides that contracts be awarded to the "lowest *responsible* bidder" after due advertisement. (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 122, par. 10−20.21.) It is the public body which specifies the terms of the contract for which it solicits bids and the criteria which bidders must meet in order to be considered a "responsible bidder." (*E.g., Smith v. F.W.D. Corp.*, 106 Ill. App. 3d at 431.) As the *Nielsen* court, quoting 10 E. McQuillin, Municipal Corporations §29.73a, at 429-30 (3d ed. 1981), stated, " '[i]n proper circumstances a contract may be awarded to one who is not the lowest bidder, where this is done in the public interest, in the exercise of discretionary power granted under the laws, without fraud, unfair dealing, or favoritism, and where there is a sound and reasonable basis for the award as made.' " (*S.N. Neilsen Co.*, 81 Ill. 2d at 299.) Similarly, in *Cardinal Glass Co. v. Board of Education of Mendota Community Consolidated School District No. 289* (1983), 113 Ill. App. 3d 442, 448, 447 N.E.2d 546, 550, the court, citing *Nielsen* and McQuillin, stated that "[w]hile it is clear that under the statute the Board has discretion to determine who is the lowest

responsible bidder, and that it need not be the lowest bidder in terms of contract price, nevertheless, under the statute, the Board has the duty to award the contract to the lowest responsible bidder and that bidder, having so established himself, has a right to be awarded the contract."

■ In the instant case, the Board has failed to present any facts to support its assertion that contracts with HMOs are not adapted to competitive bidding. The Board acknowledged its authority to establish criteria and specifications for contracts with HMOs; indeed, the Board argued that it awarded the four contracts at issue on the basis of both cost effectiveness and program offerings. These are the same factors which the Board would consider in determining the lowest responsible bidder of the HMOs submitting competitive bids. The Board offers no persuasive facts or arguments why a State-certified HMO, such as Compass, should not be allowed to participate in a competitive bidding process which would inure to the benefit both of CPS employees and, ultimately, the taxpayers who fund their health care plans.

The court also found that despite the Board's reliance on the professional skills exception of the statute in its pleadings and arguments, its decision to contract with certain HMOs and to discontinue contracts with others was not based upon the professional skills of the HMOs or of the health care providers associated with the HMOs. Rather, the court found, the decision was "strictly a matter of numbers," the four HMO plans with the largest enrollment of CPS employees being retained.

These factual findings are supported by the record. Attached to Compass' complaint is the July 1990 letter to Compass from the Board's chief operating officer, Robert Sampieri, explaining the Board's decision regarding future HMO contracts. That letter states in pertinent part:

"[O)ur outside consultants recommended that we reduce the number of HMO's offered from eight to four. The four HMO's with the fewest number of our employees were discontinued. In the case of Compass, our fifth largest HMO, this proved to be a very tough decision. We have been very satisfied with your service since you joined us in 1985. You showed a steady growth in the enrollment of our employees in the past five years, but, we had to draw the cut-off line somewhere. Unfortunately, that line fell on Compass.

If any of your prospective clients require a reference from the Chicago Public Schools, please have them call me or ***

our Director of Risk Management. We will be very happy to recommend Compass to anyone."

The court also had before it the facts in Compass' request for admissions which were not denied by the Board: that from 1985 through August 1990, Compass satisfactorily performed as an HMO in the CPS employee medical health care program; that Compass was discontinued as an HMO available to CPS employees because it was not one of the four with the largest employee enrollment; and that during the contracting period ending August 1990, Compass' rates were less and its premium increases had been lower than any of the other participating HMOs.

Although the Board argues that its official report of August 15, 1990, states that the contracts at issue were awarded on the basis of cost effectiveness and program offerings, there is nothing in the record which substantiates that summary statement in the Board's report. To the contrary, the fact that the Board did not solicit bids allowing each HMO to delineate its program offerings and cost for the 1990-91 school year contradicts the Board's official report statement.

The documents submitted in support of Compass' allegations stand unrefuted. Thus, we concur in the trial court's findings that the HMO industry is highly competitive; that HMO contracts do not involve the type of professional skills which would render them not adapted to competitive bidding; and that the contracts at issue were not awarded on the basis of the professional skills, program offerings or cost effectiveness of each HMO, but, rather on the number of enrollees in each of the HMO plans offered to CPS employees as of June 1990. Consequently, we find no error in the trial court's ruling that HMO contracts are not exempt from the competitive bidding provision of the Code.

For the reasons stated, the orders of the trial court denying the Board's motion to dismiss, granting summary judgment for Compass, and ordering the Board to comply with the competitive bidding requirements of the Code are affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.