NOS. 4-97-0198, 4-97-0274 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

DOYLE PLUMBING & HEATING COMPANY, a )  Appeal from

Delaware Corporation, )  Circuit Court of

Plaintiff-Appellee, )  Adams County

v. (No. 4-97-0198) )  No. 97CH13

THE BOARD OF EDUCATION, QUINCY PUBLIC )

SCHOOL DISTRICT NO. 172, )

Defendant-Appellant, )

and )

E.A. WAND PLUMBING & HEATING COMPANY, )

Defendant. )

----------------------------------------)

DOYLE PLUMBING & HEATING COMPANY, )

Plaintiff-Appellee, )

v. (No. 4-97-0274) ) 

THE BOARD OF EDUCATION, QUINCY PUBLIC )

SCHOOL DISTRICT NO. 172, )

Defendant, )

and )  Honorable

E.A. WAND PLUMBING & HEATING COMPANY, )  Mark A. Schuering,

Defendant-Appellant. )  Judge Presiding.

_________________________________________________________________

JUSTICE GARMAN delivered the opinion of the court:

Doyle Plumbing and Heating Company (Doyle), based in Jack­son­ville, Illi­nois, submitted the lowest bid on a boiler replacement project for the Board of Education, Quincy Public School District No. 172 (Board), but was not awarded the contract.  Rather, the Board voted to award the contract to E.A. Wand Plumbing & Heating Company (Wand), a corporation based in Quincy, which bid $3,855 more than Doyle.  Doyle sued Wand and the Board, alleging a violation of section 10-20.21 of the School Code (Code) (105 ILCS 5/10-20.21 (West 1994)), a competitive bidding statute.  The circuit court of Adams County held for Doyle and ordered the Board to grant it the contract.

The Board and Wand appeal.  We affirm.

I.  BACKGROUND

In the summer of 1996, the Board authorized a project to replace the boilers in Quincy Junior High School.  It hired Architechnics, Inc., to design and coordinate the project.  In January 1997, Architechnics solicited bids in the Quincy Herald-Whig (the local Quincy paper).  Todd Moore, an engineer with Architechnics, also contacted some firms by phone to inform them of the pro­ject because he wanted to be sure to get more than one bid on it.  One of the con­tractors he con­tacted was Doyle.  Doyle bought the bid speci­fica­tions, attended meetings in Quincy relat­ing to the project, and decided to submit a bid, as did Wand and three other firms. 

In Febru­ary, Architechnics opened and tabulated the bids.  Doyle's bid of $416,895 was the lowest, fol­lowed closely by Wand's bid of $420,750.  However, the building committee of the Board recommended that the Board award the contract to Wand, because of the travel time between Jacksonville and Quincy.

After he threatened litigation, Ed Doyle was allowed to attend a special meeting of the Board on Febru­ary 26.  He was allowed to make a presentation about Doyle and say why he felt it was qualified to do the work, but was not allowed to discuss technical aspects of the boilers; his request to have engineers present at the meeting was denied.  Ed testified Doyle had done similar work, both installation and servic­ing, for a number of other entities over a geographical area ranging from Maywood and Melrose Park in the Chicago area to Paris, Illinois, and Terre Haute, Indiana, in the east, to Pike County and Macomb in the west and even into Missouri for commission­ing services.  He had told the Board his response time was "well within industry stan­dards" and service on the boilers was "so easily handled it means nothing to take care of this job."  He also noted that although he "cannot put an 18,000[-]pound boiler in [his] truck," he could and did take replacement scan­ners, programmers, pressure controllers--"the life's breath of that system"--with him when he made service calls.  He felt Doyle had the ability to successfully complete the project and service the boilers once installed.  He did tell the Board it could realisti­cally take as long as 2½ hours to get someone on site in response to a service call (even though Jack­son­ville is only 75 miles from Quincy), because it could take some time to get someone on the road.   

James Citro is the chair of the building commit­tee and one of the members of the Board who voted in favor of giving the con­tract to Wand.  He testified since he knew nothing about boilers, he was con­cerned about any possible impact the 1½-hour delay would have, and what risk the Board might be taking in giving Doyle the contract.  He asked Ed at the meeting if he would be willing to insure them against the risk of their losing a day's state aid "or any other damage that might occur because of that hour and a half window."  When Ed responded that he did guarantee his work, Citro clarified that he "wasn't talking about his work; I was talking about--because he does know boilers--anything else that might happen as a result of that hour and a half; could he ensure [
sic
] us against that risk?"  Citro testi­fied that when Ed said he could not do so, his response was "if he couldn't take that risk, why should I?"  He did not ask Wand to insure them in the event that damages were incurred because of a delay in response to a service call; what he was asking Ed to insure against was "the risk of the hour and a half travel time that exists between Jacksonville and Quincy.  That is the risk I was concerned about.  That's the risk that doesn't exist for Wand, and that was the difference."  

The Board gave the project to Wand, by a vote of 4 to 2 (one member not present).  All of the members who voted to give the project to Wand testified they did so because of con­cerns about "service­ability."  However, none of the members had any reason to doubt Doyle was qualified to service the boilers.  Their concerns stemmed, rather, from the 1½-hour travel time between Jacksonville and Quincy, and the possibility that the school might have to be shut down (with a resulting loss of state funding) because of that delay.

The circuit court held for Doyle.  It found the Board members who voted for Wand were acting in good faith, but concluded the "discretionary power was not properly utilized," and it had resulted in a "manifest injustice."  It granted Doyle declar­atory judgment, 
mandamus
 and a preliminary injunction, and required the Board to award the project to Doyle, which it declared to be "the lowest responsible bidder pursuant to stat­ute."

II.  ANALYSIS

A.  The Competitive Bidding Statute

The Board was required to comply with the competitive bidding section of the Code (105 ILCS 5/10-20.21 (West 1994)) in awarding the contract in this case.  Section 10-20.21 of the Code provides that Boards must

"award all contracts for purchase of sup­plies, materials or work or contracts with private carriers for transportation of pupils involving an expenditure in excess of $10,000 
to the lowest responsible bidder, considering conformity with specifications, terms of delivery, quality and serviceability
, after due advertisement, [with exceptions none of which apply in this case]."  (Em­phasis add­ed.)  105 ILCS 5/10-20.21 (West 1994).

The Board admits the bid speci­fi­ca­tions made no refer­ence to servic­ing of the boilers, but argues it acted within its discretion in awarding the con­tract to Wand because the statute allows consid­eration of "ser­vice­abil­i­ty."  A threshold question is thus what "serviceability" means.  Three possibilities are (a) the contractor's ability to provide service or repairs on the contracted-for supplies, materials or work; (b) the intrinsic repairability of the supplies, materials
 or work; or (c) the usefulness or durability of the supplies, materials or work.  For the Board to prevail, it must refer to the "service ability" of the bidder, because so far as the record reflects Doyle and Wand were to install identical products.

The meaning of this term was not fully briefed by the parties.  Both seem to have assumed that it refers to the bidder's ability to provide service.  We nevertheless find it is necessary and appropriate to construe the statute before considering the Board's argument, which is based thereon.  See 
J&B Steel Contrac­tors, Inc. v. C. Iber & Sons, Inc.
, 162 Ill. 2d 265, 270, 642 N.E.2d 1215, 1218 (1994).

We begin with the primary rule of statutory construction, which is to ascertain and give effect to the true intent and meaning of the legislature.  
In re
 Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989
, 167 Ill. 2d 161, 168, 656 N.E.2d 1049, 1053 (1995).  The language of the statute is generally the best indication of legislative intent, and the terms of the statute should be given their ordinary meaning.  
Tax Year 1989
, 167 Ill. 2d at 168, 656 N.E.2d at 1053.  However, where the statutory language does not make the meaning of the statute clear, a court may look beyond the language employed and consider the purpose of the law and the evils the law was designed to remedy.  
Tax Year 1989
, 167 Ill. 2d at 168, 656 N.E.2d at 1053.  Statutes should also be construed in conjunction with other statutes on the same subject.  
Tax Year 1989
, 167 Ill. 2d at 168-89, 656 N.E.2d at 1053.

The dictionary definition of "serviceability"--its "ordinary meaning"--is "fit­ness to give ser­vice:  usefulness for a pur­pose:  wearing quali­ty:  durability, serviceableness."  Webster's Third New Inter­na­tion­al Dictionary 2075 (1986); see also Merriam Webster's Collegiate Dictionary 1070 (10th ed. 1996) (no defini­tion for "serviceabili­ty," but notes it is the noun form of "ser­vice­able," which is defined as "1: help­ful, useful  2:  fit for use").  A plain reading of the term thus rules out option (b), above, that it refers to the intrinsic repairability  of the supplies, materials or work.  It could obviously refer to the usefulness or durability of the supplies, materials or work.  But it could also refer to the bidder's ability to provide service, since serviceability can mean "fitness to give service," and "service" can mean "repair or provide maintenance for" (Webster's Third New International Dictionary 2075 (1986)).  Since neither of these meanings is ruled out by the context in which the term is used, we must turn to other sources to ascertain the legislature's intent.

Other Illinois "lowest responsible bidder" statutes allow consideration of "serviceability."  See 30 ILCS 505/6(a) (West 1994) (Illinois Purchasing Act); 30 ILCS 510/2 (West 1994) (State Paper Purchasing Act); 70 ILCS 1205/8-1(c) (West 1994) (Park District Code); 70 ILCS 2305/11 (West 1994) (North Shore Sanitary District Act); 70 ILCS 2405/11 (West 1994) (Sanitary District Act of 1917); 110 ILCS 805/3-27.1 (West 1994) (Public Community College Act).  Although the legislature has not defined the term in any of these other statutes, some of them do provide indicators as to its meaning.  Section 2 of the State Paper Purchasing Act provides that the determination of who is the lowest responsible bidder must "include a consideration of his conformity with specifications of terms of delivery and the quality and
 serviceability of his product
."  (Emphasis added.)  30 ILCS 510/2 (West 1994).  In this statute, "serviceability" refers to the product being supplied, rather than the supplier's ability to provide repairs or maintenance.  The two sanitary district statutes also use "serviceability" to refer to products.  See 70 ILCS 2305/11 (West 1994); 70 ILCS 2405/11 (West 1994) (both allow the decision maker to consider the "serviceability of the articles supplied").  This supports the conclusion that it was also used to refer to products in the Code.

Consideration of the purpose of section 10-20.21 also supports the conclusion that the term refers to the supplies, materials or work, rather than the bidder.  The purpose of competi­tive bidding statutes is "'inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption and to secure the best work or supplies at the lowest price practica­ble.'"  
Court Street Steak House, Inc. v. County of Tazewell
, 163 Ill. 2d 159, 165, 643 N.E.2d 781, 784 (1994), quoting 10 McQuillin on Mu­nic­i­pal Cor­porations §29.29, at 375 (3d ed. 1966); see also 
Smith v. Intergovern­mental Solid Waste Disposal Ass'n
, 239 Ill. App. 3d 123, 139-40, 605 N.E.2d 654, 664-65 (1992), quoting 10 G. O'Gradney & C. Miller, McQuillin on  Mu­nic­i­pal Cor­porations §29.29, at 375 (3d rev. ed. 1990) (hereinafter McQuillin); 
Com­pass Health Care Plans v. Board of Educa­tion
, 246 Ill. App. 3d 746, 751, 617 N.E.2d 6, 9 (1992); 
O'Hare Ex­press, Inc. v. City of Chicago
, 235 Ill. App. 3d 202, 208, 601 N.E.2d 846, 850 (1992); 
Smith v. F.W.D. Corp.
, 106 Ill. App. 3d 429, 431, 436 N.E.2d 35, 36 (1982).  This purpose would clearly not be served by interpreting "serviceability" to refer to the bidder's ability to provide maintenance on the supplies, materials or work when the contract makes no reference to service.  That interpretation would stifle competition because it would protect favoritism.  The shield of serviceability could be raised in defense of 
any
 contract being awarded to a local bidder, so long as it is possible that some maintenance or repairs might be required at some point in the future.  No contractor would bid on out-of-town projects if it could lose the contract just because it was farther away than a local bidder, 
i.e.
, simply because it was from out of town.  

This does not not mean that the Board acted improperly or was motivated by favoritism in this case.  The circuit court explicitly found the Board members were acting in good faith, and we do not question that determination.  But this interpretation of "serviceability" could lend itself to future abuse.  

Interpreting "serviceability" as referring to the usefulness or durability of the supplies, materials or work, on the other hand, would promote the purpose of the statute.  Although bid specifications "should be stated as definitely as is practicable," they should not be so specific as to preclude competition because only one firm can feasibly comply with them.   See McQuillin §29.53, at 444.  Allowing the decision maker to consider durability and usefulness in the interstices of the specifications will prevent this result and, thus, foster competition.  McQuillin observes:

"Where the thing sought to be purchased or contracted for is not entirely subject to exact specification, as where there are a number of different kinds in the market all meeting the requirements to a greater or less degree, the officers should consider the 
quality and utility of the thing offered, and its 
adaptability to the purpose for which it is required
."  (Emphasis added.)  McQuillin §29.75, at 518.

"[S]erviceability," as used in section 10-20.21 of the Code, refers to the durability or usefulness and fitness of the supplies, materials or work on which bids are solicited.  105 ILCS 5/10-20.21 (West 1994).  Therefore, the argument of the Board that this term allows consideration of the response time of a bidder (when no such requirement is included in the bid specifications) fails.

The Board has relied heavily in its argument on 
Court Street Steak House
.  The competitive bidding statute at issue in 
Court Street Steak House
 required a county to award contracts to the "'lowest responsible bidder,'" taking into account "'the quali­ties of the articles supplied, their conformi­ty with the specifi­cations, their suit­ability to the requirements of the county and delivery terms.'"  
Court Street Steak House
, 163 Ill. 2d at 163, 643 N.E.2d at 783, quoting Ill. Rev. Stat. 1991, ch. 34, par. 5-1022(2)).  The court stated it was accept­able for Tazewell County to accept a bid that was not the lowest because the second-lowest bidder had a train­ing program for the mentally handi­capped (
Court Street Steak House
, 163 Ill. 2d at 168, 643 N.E.2d at 785), which the county could have considered because of the statutory reference to "suit­ab[il­i­ty] to the re­quire­ments of the County" (
Court Street Steak House
, 163 Ill. 2d at 167, 643 N.E.2d at 784-85). 

The above analysis does not control this case.  First, it concerned a different term in a different statute.  Also, as was observed in Justice Heiple's concurrence, 
this entire analy­sis was 
dictum
.  
Court Street Steak House
, 163 Ill. 2d at 173, 643 N.E.2d at 787-88 (Heiple, J., concurring).  The court defined the issues before it in that case as "(1) whether the County's determi­nation of the lowest respon­si­ble bidder is subject to 
mandamus
, and (2) whether lost profits are available to an unsuc­cessful bidder as a remedy for violation of the stat­ute."  
Court Street Steak House
, 163 Ill. 2d at 163, 643 N.E.2d at 783.  It answered both questions in the negative (
mandamus
 was un­available because the contract period had already expired (
Court Street Steak House
, 163 Ill. 2d at 168, 643 N.E.2d at 785) and lost profits were not recoverable under the statute for policy reasons (
Court Street Steak House
, 163 Ill. 2d at 170, 643 N.E.2d at 786)), which controlled the result.  The remaining analysis is 
dictum
 and not controlling precedent.  See 
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 138, ___ N.E.2d ___, ___ (1997) (Heiple, J., specially concurring), citing 
Geer v. Kadera
, 173 Ill. 2d 398, 414, 671 N.E.2d 692, 699 (1996).

B.  Other Points Raised on Appeal

The Board has alleged several other errors in the circuit court proceedings, which may be dealt with briefly.  First, the Board's argument that the circuit court erred in denying its motion for a directed finding at the close of Doyle's evidence is based on its erroneous assumption about the meaning of "serviceability" and, accordingly, fails.  Second, the circuit court's refusal to strike paragraph 20 of count I of the complaint is moot, because the court granted no relief based on this paragraph.  Third, the alleged error in granting the temporary restraining order (TRO) is moot and untimely.  See 
Harper v. Missou­ri Pacific R.R. Co.
, 264 Ill. App. 3d 238, 242-43, 636 N.E.2d 1192, 1196-97 (1994) (a TRO becomes moot once it has expired); 
Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.
, 94 Ill. 2d 535, 545, 447 N.E.2d 288, 293 (1983) (if not appealed before hearing on a prelimi­nary injunc­tion, a TRO "merge[s] with the prelim­i­nary injunc­tion" or becomes "
func­tus
 
officio
"); 
Wil­liams v. Nagel
, 251 Ill. App. 3d 176, 179, 620 N.E.2d 1376, 1378 (1993) (since a TRO is appeal­able under Supreme Court Rule 307(d) (134 Ill. 2d R. 307(d)), a party must appeal a TRO within the time limit therein (two days) or lose his right to do so).   

Nor did the circuit court err in granting Doyle 
man­da­mus
 despite its finding the members of the Board acted in good faith.  Good-faith reliance on an incorrect understanding of the law is not inconsistent with an abuse of discre­tion, and bad faith need not be found for a court to reverse a decision under a competitive bidding statute.  See McQuillin §29.83, at 538-39.  

Finally, the circuit court's discussion of the impropriety of Board member Citro's request of a guarantee is simply an alternate basis for the court's holding in favor of Doyle.  We need not reach this issue as we have already affirmed the circuit court's conclusion on other grounds.

C.  Supplement to Record

In our analysis of this case we have not relied on the tran­script of a May 5 hearing before the circuit court with which Doyle has moved to supple­ment the record on appeal.  The motion is denied.  Although a court may take judi­cial notice of its own acts in the same case (see 
In re A.T.
, 197 Ill. App. 3d 821, 834, 555 N.E.2d 402, 411 (1990)), the trial court obviously did not have this transcript before it when it made its March 27 ruling.  The general rule is that "mate­rial which was not part of the court record or consid­ered by the trial court is not part of the record on appeal and should not be considered by the appel­late court."  
Smith v. First National Bank
, 254 Ill. App. 3d 251, 258, 624 N.E.2d 899, 905 (1993).  There is no reason to deviate from that rule in this case.

 III.  CONCLUSION

The Board did not have any concern about the product the lowest bidder would supply, nor about its ability to successfully complete every task required in the bid specifications.  Its only justification for its decision to grant the boiler installation contract to an entity other than that which submitted the lowest bid is that the lowest bidder is from out of town (75 miles away, directly connected by a four-lane highway), which would increase response time on service calls.  The Board admits that there was no response time requirement in the bid specifications and that in fact the installer was not even required to provide service on the boilers (except for a standard one-year warranty clause).  Its only argument for considering response time is a reference to "serviceability" in the relevant competitive bidding statute.  However, as we have determined, this term does not refer to the ability of a bidder to repair or maintain products, services or work, but rather simply allows the Board to consider the usefulness for its purposes of the products, services or work the bidder offers to supply, when the bid specifications have, in the interest of promoting competitive bidding, failed to make an exact specification.

For the reasons above stated, we affirm the judgment of the circuit court of Adams County.

Affirmed.

STEIGMANN, P.J., and GREEN, J., concur.