*In re* ESTATE OF HAZEL A. ALLISON, Deceased (Wayne O. Allison *et al.*, Appellants, v. W. John Allison Ex'r of the Last Will and Testament of Hazel A. Allison, Appellee).

Third District   No. 3—85—0195

Opinion filed January 9, 1986.—Rehearing denied February 18, 1986.

Robert C. Stoerzbach and Daniel B. Stoerzbach, both of Barash, Stoerzbach & Henson, of Galesburg, for appellant Wesley R. Allison.

John M. Hanlon, of Hanlon & Ruedig, of Galesburg, and R. Phillip Steele, of Massie & Steele, of Alpha, for other appellants.

Andrew Main and David Simpson, both of McLaughlin, Hattery, Simpson & Sullivan, of Galesburg, for appellee.

PRESIDING JUSTICE HEIPLE delivered the opinion of the court:

Hazel A. Allison (Hazel) died in December 1982. She is survived by five children: W. John Allison (John), Wesley Allison (Wesley), Wayne Allison (Wayne), Phylinda Lampe (Phylinda) and Rachel Allison (Rachel).

At the time of her death, Hazel owned two farms in Knox County. One was a 70-acre tract commonly referred to as the Almgreen Farm. The other was a 164-acre tract known as the Fox Farm. The Almgreen Farm was specifically bequeathed to Wesley Allison, while the Fox Farm passed under the residuary clause of her will to Wayne, Rachel and Phylinda.

The will of Hazel nominated John as executor of the estate. Prior to her death, Hazel had executed a crop share lease agreement with Allison Farming Company. The lease covered both farms and provided for a 50/50 crop share. The tenancy was from year to year, terminable upon notice by either party prior to September 15 of the current lease year. If this notice was not given, the tenancy would automatically extend into the February following the next crop year. At all times relevant to this appeal, Allison Farming Company was solely owned by John, who also acted as president and secretary of the corporation.

Upon Hazel's death John petitioned for letters of office and was appointed executor. This placed him in the awkward position of both landlord and tenant. Hazel's will specifically provided, however, that if farming operations were included in the estate, "the Executor shall have full power to engage in farm operations *** to lease on shares *** and to perform any other acts necessary or desirable in the discretion of the Executor to operate such farm properties ***."

While John was acting as executor, Allison Farming Company continued as tenant on both farms for the 1983 crop year pursuant to the lease between Allison Farming Company and Hazel. In the spring of 1983, the Federal government, through the Department of Agriculture, instituted the Payment In Kind program, better known as PIK. The PIK program allowed farmers to draw a certain amount of surplus commodities in exchange for their not planting such commodities. Small cash diversion payments were also part of the program. In his capacity as executor, John enrolled the estate farms in the PIK program. Pursuant to the crop share agreement and PIK regulations, John divided the grain received between the estate and Allison Farm-

ing Company. Each received 12,668 bushels of grain and $2,711.50 in diversion payments. On the first current account and report, not directly at issue here, a $1,356 diversion payment in favor of the estate was reported. On the second current account and report, the sale of PIK grain and the rest of the diversion payments were reported. However, in neither account and report was it mentioned that Allison Farming Company had received anything from the PIK program. The objection to this omission by Wesley, Wayne and Rachel, the residuary legatees, forms the basis for the principal issue in the case at bar.

The residuary legatees contend that John profited from a breach of fiduciary duty by acting as both landlord and tenant of the estate farmland. At the heart of their argument is the money John realized as tenant under the PIK program, a program in which John as executor caused the estate to participate. They would have John account to the estate for all proceeds from the sale of PIK grain and for diversion payments received.

John offers several responses to these objections. Because his mother passed away after September 15, the tenancy continued by operation of the agreement without any affirmative action on his part. Hence, there were no dealings, therefore no self-dealing. The provisions of the PIK program also required the corporation to continue on as tenant, since only the 1982 tenant could participate in the 1983 program. Most significantly, the will purportedly created and sanctioned this conflict of interest by allowing the executor to carry on farming operations. Finally, there is no allegation that John's decision to enroll the farms in PIK was either in bad faith or contrary to the best interests of the estate. The trial court overruled the legatees' objections on this point. It construed the lease and will together and concluded that it was Hazel's intention to allow such a conflict to exist.

The legatees direct our attention to *In re Will of Gleeson* (1955), 5 Ill. App. 2d 61, 124 N.E.2d 624, and *Johnson v. Sarver* (1953), 350 Ill. App. 565, 113 N.E.2d 578. In *Gleeson,* the testatrix appointed Con Colbrook as her executor. Prior to her death the testatrix had leased some of her farmland to Colbrook and a partner. The testatrix died 15 days before the beginning of the farm year. Colbrook farmed the land under the terms of the lease that year. In response to the objector's arguments, Colbrook noted that he had not time to find a suitable tenant, that it was in the estate's best interest that he hold over, that he was honest with the trust and that no loss was suffered. The court ruled as follows in reliance on *Johnson:*

"We think the [*Johnson*] decision suggests that the petitioner

herein, instead of conferring with her beneficiaries concerning continuance of his tenancy of the trust property, should have then decided whether he chose to act as a tenant or as a trustee. His election was to act as trustee and as such could not deal with himself ***." *In re Will of Gleeson* (1955), 5 Ill. App. 2d 61, 67, 124 N.E.2d 624.

In *Johnson*, the testator bequeathed all of his property in trust to three of his nine children. The three children were all living on and farming a portion of the seven farms owned by their father. It was argued that the will of the testator disclosed an intention to confer upon the trustees the right to lease the real estate to themselves. The relevant clause gave the executor the power to "carry on the farming and other business of the estate as nearly as possible and as circumstances will permit as I am now and have for many last years past ***." The court acknowledged the language, but rejected the notion that there was an intention to treat the trust differently than any other trust. If the testator had desired the result argued for by the trustees he could have explicitly provided a power to lease to themselves.

■ The net effect of the *Gleeson* and *Johnson* holdings is to call John's actions as executor and *de facto* tenant into serious question. The first questionable act was the acceptance of the office of executor. He knew that the lease would automatically extend into the 1983 farming year when he became executor. At that point, he should have either refused the position or assigned the lease. The lease contains no restrictions against assignment. The assignment might have disqualified the farms from the PIK program, but the election to participate at the 100% level was made months after John became executor. Turning to the decision to opt into the PIK program, it is undisputed that the decision was sound and that the estate was not harmed thereby. It is also the case that the profit realized by John from the set-aside would have occurred even if someone else had made the decision to participate. However, these circumstances are not entirely relevant. The profits earned by a fiduciary as the result of a self-interested transaction belong to the beneficiaries (*Bingham v. Ditzler* (1941), 309 Ill. App. 581, 33 N.E.2d 939). Had John either petitioned the court for permission to enroll the farms in PIK or resigned and allowed a substitute executor to serve, then he could have received the tenant's share of the PIK bounty without adverse consequences. However, because he allowed himself to remain in a position to profit from a self-interested transaction, the profit must be accounted for and returned to the estate.

The argument that John raised before the trial court concerning the intent of the testatrix to create such a conflict is misplaced. While there is an exception to the general principles of fiduciary responsibility where the instruments creating the relationship sanction a conflict of interest (*Childs v. First National Bank* (N.D. Ill. 1980), 494 F. Supp. 1096), the exception does not govern here. The full text of the relevant clause of the will is as follows:

> "If at any time any farm lands or farming operations shall be included in my estate, the Executor shall have full power to engage in farm operations, to purchase, sell, breed or raise livestock of any kind; to lease on shares; to plant and harvest all kinds of crops; to purchase and sell equipment and farm produce of all kinds; to make improvements; to construct and repair any buildings; and to perform any other acts necessary or desirable in the discretion of the Executor to operate such farm properties, including leases, sales, pledges or loans from or to the United States Government or any of its political subdivisions."

Read together with the open-ended lease between Hazel and Allison Farming Company, there is little doubt that Hazel intended the relationship to remain stable through the period of estate administration.

But that is all that Hazel intended. Paragraph Sixth of the will makes it abundantly clear that John was to sell the farm as soon as reasonably possible and divide the proceeds among the residuary legatees. As such, the only conflict sanctioned by Hazel was a brief, limited period of John in the dual role of landlord and farm tenant. Unfortunately, the PIK program entered into the equation. It is impossible for Hazel to have foreseen the redistribution of profits and expenses occasioned by PIK when she executed her will. Thus, the windfall profit that John earned as a result of his decision as executor to enroll the farms in PIK constituted a self-interested transaction the kind of which Hazel did not sanction.

We reiterate that the decision to participate in PIK was a sound exercise of discretion and in the best interests of the estate. Moreover, John would have been entitled to this profit if a different executor had made the decision to participate. He also could have petitioned the court for instructions or sought prior approval from the legatees. However, because John used his fiduciary office to profit from a self-interested transaction with estate property, he must account to the estate.

John argues that he did not deal with himself since the lease was between the estate and his solely owned corporation. We cannot

agree. The prohibition against self-dealing by a fiduciary cannot be avoided by use of the corporate persona. *Kinney v. Lindgren* (1940), 373 Ill. 415, 26 N.E.2d 471.

■ ■ John further contends that the propriety of the PIK transactions was adjudicated as a result of the approval of the first current account and report. Thus, objections to the second report are subject to the defenses of *res judicata* and collateral estoppel. The only transaction reported on the first accounting was the $1,356 diversion payment to the estate. Nothing was mentioned regarding Allison Farming Company. Because there was no judgment on the merits, collateral estoppel is inapplicable. (*General Parking Corp. v. Kimmel* (1979), 79 Ill. App. 3d 883, 398 N.E.2d 1104.) *Res judicata* is also inapplicable. The record suggests that the trial court did not decide in approving the first account that the payments to the tenant were proper.

Accordingly, the order overruling the legatees' objection to the second current account and report is reversed and remanded for further proceedings consistent with this opinion.

The legatees also object to the payment by the estate of the 1982 real estate taxes outstanding on the Fox Farm. This land had been bequeathed to Wesley. The estate paid the taxes in 1983 but did not allocate the expense to Wesley. The burden of taxes and other encumbrances is addressed in section 20—19 of the Probate Act:

"Except as otherwise expressly provided by decedent's will:

(a) When any real estate or leasehold estate in real estate subject to an encumbrance, or any beneficial interest under a trust of real estate or leasehold estate in real estate subject to an encumbrance, is specifically bequeathed or passes by joint tenancy with the right of survivorship or by the terms of a trust agreement or other nontestamentary instrument, the legatee, surviving tenant or beneficiary to whom the real estate, leasehold estate or beneficial interest is given or passes, takes it subject to the encumbrance and is not entitled to have the indebtedness paid from other real or personal estate of the decedent.

(b) If the representative pays all or any part of the indebtedness from assets other than the real estate, leasehold estate or beneficial interest or the income or proceeds therefrom, he is entitled to reimbursement from the legatee, surviving tenant or beneficiary and, in the event of nonreimbursement, the court may adjudge a lien on the real estate, leasehold estate or beneficial interest for the amount so paid with interest." (Ill. Rev.

Stat. 1983, ch. 110½, par. 20—19.)
Hazel's will makes no specific provision which would supercede this section of the Act.

■ The legatees contend that the general rule expressed in section 20—19(a) applies. Wesley took the land while the 1982 real estate taxes were outstanding. Thus, the land was subject to an encumbrance as defined in the Probate Act of 1975 (Ill. Rev. Stat. 1983, ch. 110½, par. 1—2.07). As such, Wesley was not entitled to have this indebtedness paid from the estate. Wesley responds that section 20—19(b) controls. He argues that the 1982 taxes were paid out of 1982 income, that is, the proceeds of the sale of that year's crop. Accordingly, section 20—19(b) dictates that the representative is not entitled to seek reimbursement from him.

We believe the trial court erred in ruling for Wesley. The 1982 taxes were not paid from "income or proceeds." When the 1982 crops were severed, they became part of Hazel's personal estate and not subject to any encumbrance related to the real estate. The proceeds from the sale of the crop should be treated similarly. The accounting method of the executor tying the receipt of crops by Hazel in 1982 to the payment of taxes by Wesley in 1983 was inappropriate under the circumstances. The court on remand shall order Wesley to reimburse the estate for the 1982 real estate taxes.

■ Finally, the legatees objected to a reimbursement to Allison Farming Company for 1982 fertilizer expenses. Prior to Hazel's death, most of the total farm acreage had fertilizer applied. When John elected to participate in PIK on all available lands, the fertilizer went unused in 1983. In the meantime, the court terminated Allison Farming Company as tenant. An expert testified that 60% of the fertilizer would be carried over to the benefit of the 1984 tenant. Accordingly, the trial court ordered the estate to reimburse Allison Farming Company for 60% of the cost of the 1982 fall fertilizer. The trial court did not abuse its discretion in so ordering.

Accordingly, the judgment of the circuit court of Knox County is affirmed as to the fertilizer expenses, but reversed on the other objections to the account. We remand for further proceedings consistent with this opinion.

Affirmed in part; reversed in part, and remanded.

SCOTT and BARRY, JJ., concur.