JUDITH K. SMITH, Plaintiff and Counterdefendant-Appellee v. FIRST NATIONAL BANK OF DANVILLE, Indiv. and as Trustee, Defendant (First National Bank of Danville, Counterplaintiff-Appellant; Possum Trot, Ltd., *et al.*, Counterdefendants).

Fourth District   No. 4—93—0007

Argued October 20, 1993.—Opinion filed December 9, 1993.—
Rehearing denied January 13, 1994.

Jonathan G. Bunge and Angela Marsh, both of Keck, Mahin & Cate, of Chicago (argued), and Timothy O. Smith, of Smith & Kagawa, of Danville, for appellant.

Karen L. Kendall, of Heyl, Royster, Voelker & Allen, of Peoria, and James C. Kearns (argued), of Heyl, Royster, Voelker & Allen, of Urbana, for appellee.

JUSTICE KNECHT delivered the opinion of the court:
Defendant, the First National Bank of Danville (the Bank), appeals from a judgment in favor of Judy Smith setting aside two promissory notes executed by Judy. We affirm.

I. FACTS

A. *Background*
The Bank has been involved with Judy's family for several generations. It was the trustee of a trust settled by Judy's grandfather as well as of a trust settled by Judy's mother. The Bank began lending money to Judy in the 1960's. In 1970, Judy inherited farmland from her grandparents' estate and hired the Bank to manage the property. In 1972 the Bank recommended Judy place the farmland in trust, referring her to attorney Carroll Snyder. Snyder drafted the documents creating the trust. Although referred to during the proceedings as a land trust, the trust was actually a revocable *inter vivos* conventional trust which had land as the *res*. The Bank was named, and agreed to serve, as trustee of the trust.

During this period, Judy lived in Arizona, but would occasionally visit the Bank to arrange for loans. The loans were structured to provide for repayment of the indebtedness out of the trust income. In arranging the loans, Judy dealt primarily with Al Schreshuhn, the president and chief executive officer of the Bank. Eventually the loans to Judy were of such magnitude the payments were significantly reducing the amount of income Judy received from the trust. Accordingly, in 1981, Judy agreed to the sale of 80 acres of the farmland and used

the proceeds to reduce her indebtedness to the Bank to approximately $94,000.

Judy testified Schreshuhn advised her from time to time regarding the extent of her assets and whether she should seek employment. The Bank also prepared tax returns on her behalf for several years. At the end of June 1983, Judy visited the Bank to arrange for a car loan. At this time Schreshuhn suggested Judy purchase the Possum Trot Tavern, move back to Illinois, and become the "Miss Kitty of Danville." This was the first time Schreshuhn had advised Judy to make an investment.

## B. *The Possum Trot Transaction*

The Possum Trot Tavern was purchased by Wilfred and Paula Smith (no relation to Judy) in 1977. The Bank lent $92,000 to the Smiths for the purchase of the Possum Trot. The Possum Trot generated inadequate income to make the payments to the Bank. In May 1983, the Bank initiated foreclosure proceedings. By 1983 the Smiths' indebtedness to the Bank was $170,000. The Smiths filed for relief under the Federal bankruptcy code (see 11 U.S.C. §101 *et seq.* (1988)).

At this time Schreshuhn and Julian Fruhling began to approach customers of the Bank to determine whether they would be interested in purchasing the Possum Trot. Some customers were approached when they came into the Bank on other business, while others were approached on the street. Melvin Price was asked if he was interested in purchasing the Possum Trot and was told the Bank would "sell it cheap" because the Bank did not wish to be in the tavern business. Price was not interested. Schreshuhn asked Marion Wright, an attorney, if he would be interested in purchasing the Possum Trot for $65,000 to $85,000. When Wright told Schreshuhn he was not interested, Schreshuhn asked if Wright thought Charlie or Craig Green might be interested. Charlie Green testified Schreshuhn asked him if he and Craig would be interested in purchasing the Possum Trot for $85,000. Green was not interested.

As of June 1983, all attempts to interest individuals in the purchase of the Possum Trot had been unsuccessful and the Bank did not know the names of any prospective purchasers. At this time Judy visited the Bank to obtain a car loan and Schreshuhn suggested to her she purchase the Possum Trot. Judy testified Schreshuhn advised her to buy the Possum Trot and she believed he was advising her in accordance with her best interests.

After leaving the Bank, Judy drove back to her home in Arizona. Immediately upon her return a series of telephone calls occurred.

Fruhling called Judy stating he heard from Schreshuhn she was interested in purchasing the Possum Trot. Judy told him she had just returned home and had not had a chance to think it over. Fruhling instructed Judy to think about purchasing the property and to call him back. Paula Smith also contacted Judy, stating she heard Judy was interested in purchasing the Possum Trot and the Smiths were asking $250,000. Judy informed Schreshuhn of this conversation; Schreshuhn told her $250,000 was "a lot of money" and advised Judy against discussing the purchase of the Possum Trot with anyone. When James Yoho, the Smiths' attorney called, Judy told him she could not discuss matters with him.

On July 18, 1983, Schreshuhn and Fruhling called Judy. Judy was told she had to "move" if she was interested in purchasing the Possum Trot because there were other individuals interested in purchasing it. They told Judy she could purchase the Possum Trot for $200,000. Judy thought the Bank was offering the Possum Trot to her, even though others were interested because Schreshuhn thought she was "special," and such an investment would be in her best interests. She also thought the Bank was offering her a good deal because the Smiths had represented the sale price as $250,000. Accordingly, Judy agreed to purchase the Possum Trot for $200,000. Fruhling told Judy to send a Mailgram offering to buy the Possum Trot. Fruhling dictated the Mailgram to Judy, which she wrote down, verbatim, and sent to Schreshuhn at the Bank. Fruhling told Judy they would take $5,000 out of her trust account for earnest money.

The Bank did not tell Judy the Smiths had been unable to successfully operate the Possum Trot and the Possum Trot had generated inadequate income, preventing them from repaying their indebtedness. The Bank also did not tell Judy the Smiths were in bankruptcy and she might get a better deal going through the bankruptcy court. The Bank also did not inform Judy it had been unable to sell the Possum Trot to others for $65,000 to $85,000. Finally, the Bank did not tell Judy it was not acting in her best interests; rather, the Bank was requesting a purchase price which would prevent it from incurring a loss on the loans made to the Smiths.

In reality, on July 18, 1983, there were no other interested buyers. A memorandum written by Fruhling to the board of directors stated the Bank would "come out whole" by selling the Possum Trot for $200,000 if the other lien holder would take a $10,000 pay down on the amount owed to it. On July 19, 1983, the Bank, at a previously scheduled hearing, requested a receiver be appointed to sell the Pos-

sum Trot; Judy's Mailgram was represented to the court as a letter of intent.

The Bank contacted Judy and informed her she should return to Illinois and begin the process of setting up a corporation and taking care of other matters regarding the Possum Trot. The Bank referred and introduced Judy to Charles Hall, the law partner of one of the members of the Bank's board of directors and one of the Bank's attorneys. Neither the Bank nor Hall advised Judy of any conflict of interest. Hall set up a corporation for Judy and submitted Judy's bid to the bankruptcy court. Hall did not advise Judy regarding the purchase of the Possum Trot. Neither the Bank nor Hall told Judy the property she was purchasing had been appraised at less than $130,000.

The sale of the Possum Trot to Judy was approved by the bankruptcy court. The sale price was ultimately reduced to $190,000 due to the removal of equipment valued at $12,500 from the premises. The Bank lent Judy the entire purchase price. Of the $190,000, $37,227.93 was paid to other creditors of the Smiths and $152,772.15 was retained by the Bank in satisfaction of the Smiths' debt. The Bank loaned Judy an additional $252,664.90 for repairs and renovations. The loans were secured by a mortgage on the Possum Trot and an assignment of Judy's beneficial interest in the *inter vivos* trust.

Judy opened the Possum Trot on March 17, 1984. Judy managed the restaurant and worked daily from 7 or 7:30 a.m. until 10 to 12 midnight. Judy wore many hats at the restaurant, working as hostess, waitress, bartender, and doing cleaning and maintenance work. In 1984 through 1987, Judy received no salary. By 1986 all of her trust income was being used to repay the indebtedness to the Bank, so Judy began to draw a salary in 1987. Judy received a salary of $15,000 in 1987, $15,600 in 1988 and $5,700 in 1989.

Judy experienced cash flow problems during the entire time she operated the Possum Trot. In 1986, when she stopped receiving her trust income, Judy consulted with the Bank regarding her financial problems. The Bank told Judy she could either sell her farmland, sell the Possum Trot, or borrow $400,000 to pay off her indebtedness to the Bank.

In 1989, the Bank found a purchaser for the Possum Trot. Although Judy invested over $400,000 in the purchase, repairs, and renovation of the Possum Trot, it was sold for only $250,000. The bank lent the new purchasers the entire purchase price. The proceeds were used to reduce Judy's debt to the Bank.

In addition to the $250,000 received by the Bank from the sale of the Possum Trot, Judy made payments totalling $106,999.24 to the

Bank. Of these payments, $7,602.64 was credited to principal and $99,396.60 to interest.

## C. *The Litigation*

In 1987, Judy filed this action alleging the Bank breached its fiduciary duty to her by inducing her to buy the Possum Trot in order to mitigate the Bank's loss on the loans to the Smiths. Judy sought compensatory and punitive damages. The Bank filed a counterclaim for payment of $148,038.99 in principal and $95,556.42 in interest on the notes related to the Possum Trot transaction (counts I and II of the counterclaim) and $339,655.32 on a note unrelated to the Possum Trot transaction.

Prior to trial the court ruled, as a matter of law, the Bank owed a fiduciary duty to Judy with regard to the Possum Trot transaction. Judy's action was tried by jury and the Bank's counterclaim was determined by the judge. The parties stipulated with respect to the counterclaim that Judy was obligated to repay the notes subject *only* to her equitable defenses. Judy alleged the notes relating to the Possum Trot transaction should be set aside, the Bank should receive no interest on the money advanced to her, and the portion of the loan retained by the Bank in satisfaction of the Smiths' indebtedness ($152,772.15) should not be considered as having been advanced to her.

The jury returned a verdict for Judy in the amount of $161,000 for out-of-pocket expenses and salaries lost and $600,000 in punitive damages. The trial court sustained Judy's equitable defenses with respect to counts I and II of the counterclaim. However, it found Judy was obligated to repay $339,655.32 to the Bank on the notes *unrelated* to the Possum Trot transaction. After trial, the parties entered into a settlement agreement regarding the judgments on Judy's claim and the notes which were unrelated to the Possum Trot transaction.

The Bank filed a post-trial motion requesting the court reconsider its ruling regarding counts I and II of the counterclaim. The trial court found the Bank used Judy to make up the loss it would have otherwise sustained on the loans to the Smiths, and if any party had to bear a loss as the result of the Possum Trot transaction, it should be the Bank.

## II. MOTIONS

Judy has filed a motion to strike portions of the Bank's reply brief which refer to and set forth a settlement agreement which is not part

of the court record. The Bank has filed a motion to supplement the record with a copy of the settlement agreement.

■■ We turn first to the Bank's motion and find it would be inappropriate to allow the Bank to supplement the record with the settlement agreement. As a general rule, material which was not part of the court record or considered by the trial court is not part of the record on appeal and should not be considered by the appellate court. (*State Farm Mutual Automobile Insurance Co. v. Stuckey* (1983), 112 Ill. App. 3d 647, 649-50, 445 N.E.2d 791, 792-93.) However, Supreme Court Rule 329 permits the record to be supplemented in order to resolve issues regarding the accuracy of the record or in the event record is insufficient to present fully and fairly the questions involved. 134 Ill. 2d R. 329.

The Bank contends the record is insufficient to fully and fairly present the issue of waiver and must be supplemented by the settlement agreement. The Bank cites *People v. Miller* (1989), 190 Ill. App. 3d 981, 548 N.E.2d 1, in support of its contention. In *Miller*, the appellate court allowed the record to be supplemented by police reports which, although not part of the record, were referred to in discovery, tendered to the defense in open court, referred to during trial, and used extensively in cross-examination. The court found the police reports were necessary to the resolution of whether the State complied with its obligation to disclose any statements made by the defendant by furnishing the defense with police reports which referred in general terms to defendant's statements. *Miller*, 190 Ill. App. 3d at 989, 548 N.E.2d at 6.

The present case is distinguishable from *Miller*. In *Miller*, the contents of the police reports were necessary to the resolution of an issue on appeal. In the present case, whether the settlement agreement is relevant to the waiver issue is dubious. However, the potential relevancy is limited to the fact a settlement agreement was *reached* with respect to the judgment on Judy's claim, it does not extend to the *contents* of the agreement. Since the fact the settlement agreement was reached is of record, we see no basis upon which to grant the Bank's motion to supplement the record. Since matters not part of the record on appeal are not properly considered by the court, we grant Judy's motion to strike the portions of the Bank's reply brief referring to or setting forth the terms of the settlement agreement.

### III. Scope Of Fiduciary Duty

The Bank contends there is no equitable basis to set aside the

notes because its fiduciary duty did not extend to the Possum Trot transaction. On May 14, 1991, the trial court ruled as a matter of law the Bank's fiduciary duty extended to the Possum Trot transaction. The Bank contends this ruling was erroneous as the Possum Trot property was not the *res* of the trust. As a result of this ruling, the Bank contends evidence was not presented on the issue of whether, as a matter of fact, the Bank had a fiduciary duty to Judy with respect to the Possum Trot transaction. Accordingly, the Bank alleges, we must reverse. Judy contends the Bank has waived consideration of this issue, and its argument would also fail if considered on the merits. We agree with the Bank the argument has not been waived. However, we also agree with Judy the Bank's argument fails on its merits.

## A. *Waiver*

Judy alleges the Bank has waived consideration of whether its fiduciary duty extended to the Possum Trot transaction as the result of the Bank's choice not to appeal the trial court's decision with respect to Judy's claim and its failure to specifically request reversal of the May 14, 1991, order in the notice of appeal.

■ Although the Bank's contention the trial court's judgment on the counterclaim ought to be reversed because its fiduciary duty did not extend to the Possum Trot transaction is inconsistent with its decision not to appeal the judgment on Judy's complaint, we do not find this inconsistency effected a waiver of the Bank's argument. A finding the Bank's fiduciary duty extended to the Possum Trot transaction was necessary to the judgment in favor of Smith on her complaint, as well as on counts I and II of the counterclaim. Thus, it is inconsistent for the Bank to allege the judgment on the counterclaim ought to be reversed because the trial court erred in finding the Bank's fiduciary duty extended to the Possum Trot transaction without alleging the judgment on the complaint be reversed on the same basis.

The Bank alleges it has not been inconsistent, but was precluded from appealing the judgment on Judy's complaint because it entered into a settlement agreement with Judy on this issue. This argument is unpersuasive. The choice to enter into a settlement agreement with respect to the satisfaction of a judgment (rather than appeal the judgment) is no different than a choice not to appeal a judgment in the absence of a settlement agreement. Regardless of the Bank's reasoning or strategic decision making, the choice not to appeal the judgment on the complaint is inconsistent with its position that judgment on the counterclaim should be reversed for reasons which would also

support the reversal of the judgment on the complaint. However, we reject Judy's argument this inconsistency constitutes waiver.

Judy cites *In re Marriage of Spomer* (1984), 123 Ill. App. 3d 31, 33, 462 N.E.2d 724, 726, for the proposition a party may expressly withdraw or eliminate an argument on appeal and any arguments that depend on the withdrawn issues will be deemed waived. In *Spomer*, respondent appealed from a judgment of dissolution of marriage alleging the judgment should be vacated and also alleging the trial court erred in determining child support and visitation. Respondent subsequently remarried and filed a motion with the appellate court requesting withdrawal of her argument that the judgment of dissolution be vacated. (*Spomer*, 123 Ill. App. 3d at 32, 462 N.E.2d at 726.) The appellate court found, since respondent withdrew her request the judgment of dissolution be vacated, it need not consider her arguments in support of vacating the judgment. Instead, it only considered respondent's arguments regarding child support and visitation. (*Spomer*, 123 Ill. App. 3d at 33, 462 N.E.2d at 726.) The present case is distinguishable as the Bank has made no express withdrawal of an issue before this court. Moreover, we do not find *Spomer* may be read so broadly as to imply withdrawal of an argument where that argument might have been raised to advocate reversal on two matters, but was raised only with respect to one matter.

Judy next seems to allege the Bank has waived consideration of the scope of its fiduciary duty for purposes of appeal because the Bank did not specifically request reversal of the May 14, 1991, order in its notice of appeal. We have previously held the notice of appeal is to be liberally construed in the absence of prejudice to the litigants. (*Smock v. Hale* (1990), 197 Ill. App. 3d 732, 737-38, 555 N.E.2d 74, 77.) Thus, a notice of appeal may be construed to bring up for review an earlier unspecified order where that order was a step in the procedural progression to the specified order. In *Smock*, plaintiff requested reversal of the order of judgment in favor of defendant. This court found two earlier orders disqualifying a medical expert and closing the schedule for discovery directly contributed to the entry of the judgment order. Therefore, we found, given the interrelationship of the orders, the notice of appeal was sufficient to confer jurisdiction to review the earlier orders. (*Smock*, 197 Ill. App. 3d at 738, 555 N.E.2d at 77-78.) Similarly, the order of May 14, 1991, was a step in the progression to the order entering judgment in favor of Judy on the counterclaim. Here, the Bank's notice of appeal requested reversal of the judgment order. Given the interrelationship of the orders, we find the

notice of appeal has conferred jurisdiction upon this court to review the propriety of the May 14, 1991, order.

### B. *Propriety Of The Trial Court's Ruling*

The Bank contends the trial court erred in ruling, as a matter of law, its fiduciary duty extended to the Possum Trot transaction. The propriety of a ruling on a matter of law is reviewed *de novo*. (See *Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 899, 388 N.E.2d 1008, 1011.) Accordingly, we review the trial court's ruling *de novo*.

A fiduciary relationship arises as a matter of law between the trustee and beneficiary, as it does between attorney and client or agent and principal. However, the duty of loyalty the trustee owes to the beneficiary is more intense than in any other fiduciary relationship. (*Prueter v. Bork* (1981), 105 Ill. App. 3d 1003, 1005, 435 N.E.2d 109, 111; *Sauvage v. Gallaway* (1946), 329 Ill. App. 38, 44, 66 N.E.2d 740, 743.) This is because the trustee is in such a position of intimacy with the beneficiaries and has such great control over their property, warranting a higher standard than would be imposed in the case of an ordinary business relationship. (G. Bogert, Trusts §95, at 342 (6th ed. 1987).) Our supreme court has stated where one person occupies a relation in which he owes a duty to another, he shall not place himself in any position which will expose him to the temptation of acting contrary to that duty, or bring his interest in conflict with that duty. (*Central Elevator Co. v. People ex rel. Moloney* (1898), 174 Ill. 203, 207, 51 N.E. 254, 255.) Transactions with the beneficiary in which the trustee receives a benefit are presumed fraudulent; this presumption may be overcome by clear and convincing evidence of the fairness to the beneficiary. *Prueter*, 105 Ill. App. 3d at 1005, 435 N.E.2d at 112.

■ The issue before the court involves the scope of the fiduciary relationship. The fiduciary relationship between trustee and beneficiary clearly encompasses all transactions concerning the assets of the trust. However, the fiduciary relationship which arises as a result of the trust does not extend to transactions between the trustee and beneficiary which have no relationship to the trust. (*Brown v. Brown* (1978), 62 Ill. App. 3d 328, 333, 379 N.E.2d 634, 638.) Thus, in *Brown*, the court determined the fiduciary duty arising from the trustee-beneficiary relationship did not extend to a transaction involving the beneficiary's conveyance of her home, which was not part of the trust *res*, to the trustee in exchange for the trustee's promise to support her for the rest of her life. (*Brown*, 62 Ill. App. 3d at 333, 379 N.E.2d at 638.) Similarly, in *Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 609, 470 N.E.2d 1047, 1053, the court noted, outside

the trust relationship, a trustee may deal with his beneficiary as if no fiduciary relationship existed and the fiduciary relationship will not extend to non-trust property.

However, in both *Brown* and *Obermaier*, the court was reluctant to allow the trustee to benefit in a transaction with the beneficiary, even though the transaction might not have been encompassed in the fiduciary relationship which arose as the result of the trust relationship. Thus, in *Brown*, the court remanded for determination of whether, as a matter of fact, a fiduciary relationship arose as the result of other circumstances apart from the trust relationship. (*Brown*, 62 Ill. App. 3d at 334-35, 379 N.E.2d at 638-39.) Likewise, in *Obermaier*, the court found that where a trustee fraudulently misleads the beneficiary, the transaction may be set aside even though it was not encompassed by the fiduciary relationship. *Obermaier*, 128 Ill. App. 3d at 609, 470 N.E.2d at 1053.

A transaction which does not directly involve the assets of the trust, but results in the trustee taking a security interest in the trust, does not fall neatly into either of the two categories: it does not directly involve the trust assets, yet it cannot be said that it has "no connection" with the trust. Although the parties have cited no Illinois authority which unequivocally resolves this issue, and we have found none, we conclude the better position is to extend the fiduciary duty to transactions proposed by the trustee which cause the trustee to become the creditor of the beneficiary and are structured by the trustee to give the trustee a security interest in the trust.

The mere use of the trust, or an interest in the trust, as security for a loan by the trustee to the beneficiary has been found to cause the fiduciary duty to extend to the loan transaction. In his treatise on trusts, Bogert notes the rules applicable to direct dealing between trustee and beneficiary apply to *all* transactions between trustee and beneficiary which concern the interest of the beneficiary under the trust, including mortgages. (G. Bogert, Trusts §96, at 349 (6th ed. 1987), citing *Assets Corp. v. Perrin Properties, Inc.* (1941), 48 Cal. App. 2d 220, 119 P.2d 375.) In *Assets*, the trustee accepted a security interest in property which was the *res* of the trust to secure promissory notes executed by the beneficiaries. (*Assets*, 48 Cal. App. 2d at 222-23, 119 P.2d at 377.) The court held the trustee had a fiduciary relationship to the beneficiaries with respect to this transaction and was bound to disclose all material facts within its knowledge. (*Assets*, 48 Cal. App. 2d at 226, 119 P.2d at 379.) We find Bogert's treatise and the *Assets* decision persuasive. We believe this position is consistent with the authority discussed above regarding the high duty of loy-

alty placed upon a trustee and the general aversion to allowing a trustee to benefit in dealings with the beneficiaries. We also believe this position is consistent with our supreme court's decision in *Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 432 N.E.2d 841.

The *Zarkin* case involved a land trust. The supreme court determined, with respect to the trustee-beneficiary relationship, land trusts were to be treated no differently from any other trust. Thus, land trustees are subject to the fiduciary duties imposed by law on all trustees and the general principles of trust law are applicable. (*Zarkin*, 89 Ill. 2d at 239, 432 N.E.2d at 845.) The court concluded the trustee's duty of loyalty would preclude it from acquiring an interest in the trust adverse to that of the beneficiaries, and this rule would extend to the acquisition of a lien on the beneficial interest. The record did not disclose the circumstances of a loan made by the trustee to the beneficiary or of the beneficiary's assignment of the beneficial interest to the trustee. The court remanded for further proceedings to determine these issues, finding the trustee must bear the burden of demonstrating the fairness of the transactions, the disclosure of the conflict of interest, and the consent of the beneficiary. *Zarkin*, 89 Ill. 2d at 246, 432 N.E.2d at 849.

By stating trusts and land trusts are to be treated similarly with respect to the trustee-beneficiary relationship, and this relationship would cause the acceptance of a security interest to come under scrutiny, the implication is the trustee-beneficiary relationship arising as the result of a conventional trust would also cause the acceptance of a security interest to be scrutinized. The court's holding, with respect to land trusts, is no longer viable in light of the Land Trustee as Creditor Act (Act) (Ill. Rev. Stat. 1991, ch. 148, par. 80 *et seq.*), which sanctions the practice of the extension of credit from land trustees to beneficiaries and the acceptance, by land trustees, of a security interest in the trust. Specifically, the Act provides the fact a land trustee becomes the creditor of the beneficiary shall not be a breach of, or evidence of a breach of, any fiduciary duty owed by the trustee to the beneficiary. (Ill. Rev. Stat. 1991, ch. 148, par. 83.) However, the Act is limited, by its terms, to land trusts and therefore does not alter the law with respect to conventional trusts.

The argument could be made the *Zarkin* rule—that a trustee of a *conventional* trust breaches his fiduciary duty to the beneficiary merely by taking a security interest in the trust, or the beneficial interest—remains viable. However, we need not determine this issue at the present time as the trial court determined the Bank's *conduct*

constituted a *breach* of fiduciary duty as matter of *fact*, and the Bank has not appealed this determination. In this case, we determine only that the trial court did not err in holding the fiduciary relationship *extended* to a transaction in which the Bank took a security interest in the trust property. We do not determine whether such *conduct* also, as a matter of law, constituted a breach of the fiduciary duty.

We believe several fundamental differences between land trusts and conventional trusts weigh in favor of a finding the fiduciary relationship between beneficiary and trustee is broader in scope in the case of conventional trusts than in land trusts. In a conventional trust, the trustee manages the trust *res*. A fiduciary obligation to the beneficiary is imposed because the trust relation readily lends itself to secret exploitation, a trustee with a conflict of interest is bound to exploit the trust, and the chance of the beneficiary discovering the exploitation is remote. Hoover, *Basic Principles Underlying Duty of Loyalty*, 5 Clev.-Mar. L. Rev. 1, 7 (1956).

A land trust, conversely, is less a trust than a legal fiction whereby an individual converts his ownership interest in real property to ownership interest in personal property. (See *People v. Chicago Title & Trust Co.* (1979), 75 Ill. 2d 479, 492, 389 N.E.2d 540, 545.) Although title to the *res* is in the trustee, the trustee has no duties with respect to the management and control of the *res*. The beneficiary manages and exercises all rights of ownership, with the exception of holding or dealing with title to the *res*. The beneficiary retains the power of direction with respect to dealings with title, and the trustee acts only at the direction of the beneficiary. *Robinson v. Chicago National Bank* (1961), 32 Ill. App. 2d 55, 58, 176 N.E.2d 659, 661.

The land trustee does not possess the intimate knowledge of the income-producing potential of the *res* and other knowledge which is learned in the course of acting as trustee for a conventional trust. Moreover, the land trustee does not assume the role of decision maker with respect to the property of the beneficiary, whereas the trustee in a conventional trust does so as a matter of course. Thus, the beneficiary of a conventional trust is more susceptible to the overreaching of the trustee. Since the beneficiary of the land trust—rather than the land trustee—manages the property, and the trustee acts only at the direction of the beneficiary, some argue the potential for abuse of the position of trustee is significantly less in a land trust than in a conventional trust, and the rationale for imposing fiduciary obligations upon conventional trustees is absent from a land trust arrangement. Comment, *Land Trustee as Secured Creditor: Fiduciary Duties Revisited*, 1982 S. Ill. U.L.J. 249, 264.

Moreover, there are reasons for relaxing the fiduciary obligations of the land trustee which are not present with respect to conventional trusts. In enacting the Act, the legislature recognized an institution might be selected as trustee of a land trust, not for its managerial expertise, but simply because that institution will be asked by the beneficiaries to extend credit to the beneficiaries, secured by their interest in the trust. (Ill. Rev. Stat. 1991, ch. 148, par. 81(a)(4).) The legislature additionally found it was in the interest of fostering and encouraging the availability of financing for owners and developers of real estate to permit the land trustee to lend money to and become the secured creditor of the beneficiary. (Ill. Rev. Stat. 1991, ch. 148, par. 81.) Such reasons are inapplicable to conventional trusts.

■ In conclusion, we find the fiduciary obligations of a trustee of a conventional trust extend to transactions proposed by the trustee which result in the trustee becoming the creditor of the beneficiary, and where the beneficiary's indebtedness is secured by an interest in the trust. Accordingly, we affirm the circuit court's determination that the Bank's fiduciary duty to Judy extended to the Possum Trot transaction. Since the Bank has not appealed the determination its conduct constituted a breach of the fiduciary duty, we do not review this determination, but turn to the Bank's final argument regarding the effect of the breach of fiduciary duty.

### IV. Effect Of Breach Of Fiduciary Duty On Smith's Liability On The Promissory Notes

The Bank alleges the trial court erred in denying it recovery on the promissory notes, claiming Judy cannot both recover damages for the Bank's breach of fiduciary duty and have the notes set aside. We disagree. Judy is entitled to have the promissory notes set aside due to the Bank's breach of fiduciary duty. The setting aside of the promissory notes relieves Judy of her obligation to pay interest at the rate specified in the notes. However, the principal must be returned to the Bank. (See *Brown*, 62 Ill. App. 3d at 334-35, 379 N.E.2d at 639.) Judy is entitled to a setoff for amounts paid to the Bank in satisfaction of the promissory notes. Judy is additionally entitled to a setoff in the amount of the benefit received by the Bank as the result of the Possum Trot transaction. See *In re Estate of Allison* (1986), 140 Ill. App. 3d 183, 187, 488 N.E.2d 1035, 1038.

The evidence at trial established the Bank advanced $442,664.90 to Judy in conjunction with the Possum Trot transaction and had been repaid $356,999.24. The Bank contends it is entitled to judgment on the promissory notes in the amount of $243,595.41. Thus, the

Bank's position is it is entitled to receive a total of $600,594.65 ($356,999.24 plus 243,595.41). This would permit the Bank to receive interest of $157,929.75 ($600,594.65 less 442,664.90) from Judy as the result of the Possum Trot transaction.

■ At trial, Judy contended that of the $442,664.90 advanced to her, $152,772.05 should not be considered, since this was the amount paid back to the Bank in satisfaction of the Smiths' debt to the Bank. Judy additionally drew attention to the repayment of $356,999.24 and asserted the Bank was not entitled to receive interest at her expense.

The trial court found in favor of Judy; in ruling on the Bank's post-trial motion, the court stated:

> "[I]n the Court's opinion, the bank was out $160,000 from [Wilfred] Smith. The bank breached its fiduciary duty by— breached their trust agreement by utilizing the beneficiary to make that up."

The court concluded any loss resulting from the Possum Trot transaction should be borne by the wrongdoer, the Bank. The effect of the trial court's ruling was to set aside the promissory notes and permit the Bank recovery of the $442,664.90 advanced to Judy, with credit to Judy for the $356,999.24 repaid, no interest, and subject to a setoff of $85,665.66 for the benefit obtained by the Bank as the result of the Possum Trot transaction. We find no error.

### A. *Entitlement To Set Aside Of The Promissory Notes And Return The Principal To The Bank*

Where a trustee engages in a transaction with a beneficiary, in breach of the fiduciary obligations, the beneficiary is entitled to have the transaction set aside. The setting aside of a transaction involves the equitable remedy of rescission. (See *Brown*, 62 Ill. App. 3d at 334-35, 379 N.E.2d at 639.) A party who seeks to rescind a contract must return the entire consideration received under the contract so the other party may be placed in the same position it was in before the contract was entered into. *Brown*, 62 Ill. App. 3d at 335, 379 N.E.2d at 639.

In *Brown*, the trustee engaged in a transaction with the beneficiary which did not involve the assets of the trust. Specifically, the trustee agreed to support the beneficiary for the rest of her life if she would convey her house to him (the trustee). The house was conveyed to the trustee and he expended $21,000 for the support of the beneficiary. Upon the death of the beneficiary, an action was brought to set aside the transaction. (*Brown*, 62 Ill. App. 3d at 331-32, 379 N.E.2d at 636-37.) The trial court declined to do so; however, the appellate

court reversed and remanded for a determination of the existence of a fiduciary relationship encompassing the transaction, and if so, whether such a relationship had been abused. (*Brown*, 62 Ill. App. 3d at 333-34, 379 N.E.2d at 638-39.) If a fiduciary relationship and abuse thereof were found, the appellate court noted, the transaction could be set aside on the condition the trustee be reimbursed for the $21,000 expended for the benefit of the beneficiary. *Brown*, 62 Ill. App. 3d at 335, 379 N.E.2d at 639.

This case is similar to *Brown* as it deals with a transaction between beneficiary and trustee, not directly involving the assets of the trust, which the beneficiary seeks to have set aside. Judy is entitled to have the promissory notes set aside on the condition she returns the money advanced to her by the Bank. The evidence at trial established the Bank advanced $190,000 to Judy for the purchase of the Possum Trot property and an additional $252,664.90 to be invested in the business, for a total of $442,664.90. Judy repaid $356,999.24, leaving a balance of $85,665.66 ($442,664.90 less 356,999.24). Thus, Judy is entitled to have the promissory notes set aside on the condition she repay $85,665.66 to the Bank. Judy's obligation to repay this amount is subject to her right to the setoff in the amount of the benefit received by the Bank as the result of the Possum Trot transaction.

### B. *Setoff For Benefit Obtained By The Bank*

It is clear the trustee may not benefit in a transaction in which the trustee deals with the trust property. (*In re Estate of Swiecicki* (1984), 121 Ill. App. 3d 705, 707, 460 N.E.2d 91, 92.) We do not find this rule limited to dealings with the trust *res*, but to any dealings between trustee and beneficiary encompassed by the fiduciary relationship. When the trustee does benefit from a transaction with the beneficiary, the transaction is presumed fraudulent and such presumption may only be overcome by clear and convincing proof the transaction was fair and the trustee did not breach its duty of loyalty to the beneficiary. (*Prueter*, 105 Ill. App. 3d at 1005, 435 N.E.2d at 112.) The benefit obtained by a fiduciary inures to the person to whom the fiduciary duty is owed. *Allison*, 140 Ill. App. 3d at 187, 488 N.E.2d at 1038.

In the present case, the Smiths had filed for bankruptcy. They were indebted to the Bank in the amount of $170,000. However, efforts to sell the Possum Trot for as low as $65,000 to $85,000 had been unavailing. At the time the Bank induced Judy to purchase the Possum Trot, no bids had been received on the property and the Bank knew of no interested purchasers. Thus, in the absence of the pur-

chase of the property by Judy, the Bank's likelihood of recovering all, or even a significant part, of the money owed from the Smiths' bankruptcy estate was not promising. However, by inducing Judy to pay $190,000 to the bankruptcy estate, the Bank received $152,772.05 in satisfaction of the Smiths' indebtedness. Thus, the Bank received a benefit by inducing Judy to purchase the Possum Trot. Since this benefit inures to Judy, she is entitled to recovery of the benefit.

The $152,772.05 received by the Bank was approximately 80.4% of the $190,000 paid by Judy for the purchase of the property. Had the Bank been successful in its efforts to sell the property for $65,000 to $85,000, receiving the same percentage of the purchase price, it would have received $52,260 to $68,340. Since by convincing Judy to pay $190,000 for the property the Bank received $84,432.05 ($152,772.05 less $68,340) to $100,512.05 ($152,772.05 less $52,260) more than it would have received by selling the property for $65,000 to $85,000, and attempts to sell the property for $65,000 to $85,000 had been unsuccessful, we find the valuation of the benefit received by the Bank as $85,665.66, which was the effect of the trial court's ruling, was not an abuse of discretion.

### C. *Interest*

The Bank is not entitled to interest on the money advanced to Judy. Due to the setting aside of the promissory notes, the Bank can no longer rely on terms of the promissory notes as providing it an entitlement to interest. Thus, the Bank is not entitled to interest unless it is assessed by the court. In *Brown*, the appellate court noted a court of equity may assess interest when warranted by equitable considerations. However, the court noted an abuse of fiduciary relationship would be a consideration mitigating against an award of interest to the wrongdoer. (*Brown*, 62 Ill. App. 3d at 335, 379 N.E.2d at 639.) The Bank's breach of its fiduciary duty to Judy, in the present case, weighs against granting the Bank interest. Accordingly, we find the trial court did not abuse its discretion by not making an allowance for interest when ruling on the Bank's counterclaim.

### D. *Allowing the Notes to be Set Aside Does Not Afford Smith a Double Recovery*

Finally the Bank contends allowing Judy to defend against enforcement of the promissory notes, in addition to maintaining an action for damages resulting from the breach of fiduciary duty, affords her a double recovery. In support of its argument, the Bank cites *Lombard v. Elmore* (1986), 112 Ill. 2d 467, 493 N.E.2d 1063.

In *Lombard,* George and Michael Lombard, Elbert Elmore, and two other individuals whose interests were later acquired by Elmore, formed a partnership to operate a motel and banquet facility. George and Michael Lombard were also the principal officers of the Lombard Construction Company which contracted with the partnership to perform renovation work at the motel. The Lombards assigned their interests in the partnership to Elmore in exchange for two promissory notes totalling $40,000. The assignment agreement also provided the partnership would pay Lombard Construction Company an outstanding balance of approximately $34,000 for work performed at the motel.

Elmore did not satisfy the promissory notes and the Lombards sued. As an affirmative defense to the enforcement of the promissory notes, Elmore alleged the Lombards had failed to perform their part of the agreement to renovate the motel and he was, therefore, entitled to a setoff against the amount due on the promissory notes. (*Lombard,* 112 Ill. 2d at 469, 493 N.E.2d at 1064.) Defendant Elmore also filed a three-count counterclaim alleging the Lombards (1) understated the partnership's accounts payable by $74,851.45; (2) understated the amount due to them for construction work by $14,116.88; and (3) failed to properly renovate the motel, causing him to expend an additional $59,584.26. *Lombard,* 112 Ill. 2d at 469-70, 493 N.E.2d at 1064.

The trial court entered summary judgment in favor of the Lombards on their claim for enforcement of the promissory notes and dismissed count I of Elmore's counterclaim. Counts II and III of Elmore's counterclaim were tried by jury and judgment was entered in favor of Elmore in the amount of $46,750. *Lombard,* 112 Ill. 2d at 470, 493 N.E.2d at 1064.

The appellate court reversed the trial court's order of summary judgment on the Lombards' claim, finding whether Elmore was entitled to a setoff involved questions of fact regarding whether the Lombards understated the amount due to them and breached the agreement to renovate the motel. (*Lombard,* 112 Ill. 2d at 471, 493 N.E.2d at 1064-65.) The supreme court reversed the appellate court and affirmed the trial court. The supreme court determined Elmore was not entitled to both a setoff against the promissory notes due to the Lombards' understatement and breach of contract and recovery on a counterclaim for the Lombards' understatement and breach of contract. (*Lombard,* 112 Ill. 2d at 472, 493 N.E.2d at 1065.) The supreme court noted to allow a setoff and recovery on the counterclaim for the same

damages would grant Elmore double recovery. *Lombard,* 112 Ill. 2d at 472-73, 493 N.E.2d at 1065.

We find *Lombard* distinguishable because, in the present case, the damages alleged in Judy's action were not duplicitous of the basis for the setoff against the Bank's counterclaim.

In Judy's action, damages were awarded to compensate her for lost income and her out-of-pocket expenses, which did not include interest paid or due to the Bank on the promissory notes. The evidence at trial indicated Judy had out-of-pocket expenses of $87,457.07 with respect to the Possum Trot transaction. The evidence additionally established she managed the Possum Trot, working from 7 or 7:30 a.m. until 10 or 12 midnight. Yet over the five-year period she operated the business, she earned a total salary of $36,300, or an average of $7,260 per year. Testimony was presented a manager would ordinarily earn $30,000 to $40,000 per year. The jury was instructed to consider the amount of out-of-pocket expenses, the value of salaries lost, and the amount of the Possum Trot's taxes (for which Judy was personally liable) in determining her damages. The jury returned a verdict that Judy was entitled to actual damages in the amount of $161,460.

Since the jury did not consider the interest paid or due to the Bank on the promissory notes or the benefit received by the Bank as the result of the Possum Trot transaction, the consideration of these issues in conjunction with the Bank's counterclaim did not afford Smith a double recovery.

The Bank has cited no authority indicating the setting aside of a transaction, recovery of actual damages, and recovery of profit obtained by a trustee are mutually exclusive remedies. Rather, allowing recovery of actual damages in addition to setting aside the promissory notes is consistent with the policy of making an injured party whole. See *Central Information Financial Services, Ltd. v. First National Bank* (1984), 128 Ill. App. 3d 1052, 1062, 471 N.E.2d 992, 999.

Recovery of the benefit or profit obtained by the trustee is permitted in the absence of injury to the beneficiary. (G. Bogert, Trusts §157, at 561 (6th ed. 1987); *Pelcak v. Bartos* (1946), 328 Ill. App. 435, 441, 66 N.E.2d 465, 468.) Accordingly, we do not find either recovery of damages or the setting aside of the promissory notes precludes Judy from asserting her entitlement to the benefit obtained by the Bank as the result of the Possum Trot transaction.

## V. CONCLUSION

We affirm the trial court's determination the Bank's fiduciary duty to Judy encompassed the Possum Trot transaction and the deter-

mination of the effect of the breach of the fiduciary duty on Judy's liability on the promissory notes. The judgment in favor of Judy on counts I and II of the Bank's counterclaim is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.